## A98A0262. TUCKER v. THE STATE.
### (498 SE2d 774)

McMURRAY, Presiding Judge.

Defendant was charged in an indictment with 11 counts of armed robbery. Counts 2 though 5 were severed from Counts 6 through 11, whereupon defendant was tried before a jury on Counts 6 through 11 renamed 1 through 6 and found guilty of only a single charge: Count 2 (formerly Count 7), alleging defendant "did along with Demarco Alexander, with intent to commit theft, take from the person of Stephanie Joy Knox, . . . a purse containing U. S. currency, personal items, and necklaces, by use of a handgun, the same being an offensive weapon." The evidence in support of this charge revealed that about 7:00 p.m. on April 16, 1996, Stephanie Knox was proceeding up the steps to her Brookstone apartment door when she was accosted by "someone running behind [her]. . . . The guy had his head down and he was acting like he was going down to the apartment below [her, but when she reached] the top of the steps, then he started running up the steps [with] the gun pointed at [her]. He told [her] to turn back around and [she] did. . . . Then he told [her] to give him [her] jewelry and [she] snatched it off and gave it to him and he grabbed [her] pocketbook." Ms. Knox could not see the face of the robber "because he had his head down both times when he was walking downstairs and when he was coming upstairs." The next day, she "received [her] purse back [from the police] . . . received one of the chains back and it was broke. And [she] had a money order and that was cashed. It was in [her] pocketbook."

Emmett Brown, a neighbor of Stephanie Knox, "noticed this strange car [had] come into the parking lot, . . . a gray, Dodge Omni. So this guy about 6′ 2″ got out of the car, walked down the parking lot and ducked behind the bushes into the other apartment complex. . . ." Certain that something strange was happening, Emmett Brown "grabbed a trash bag and went outside and as [he] was going out this guy was coming towards [Brown] with a pocketbook up under his shirt. As [Brown] passed him he had a gun up under his shirt also. [Brown] was getting ready to say something to him and then he looked at [Brown] kind of strange like, 'What are you looking at?' So [Brown] just kept walking towards the dumpster. . . . As [Brown] was coming back the car was coming out of the apartment complex and that's when [Brown] saw the tag number and everything." Brown saw two males in the car and relayed this information, including the tag number, to the police.

James Williamson of the Clayton County Police Department received the lookout for "a gray Dodge Omni with a Florida tag of K-C-G-2-6-A that was seen leaving the area." When Officer Williamson stopped the vehicle, the driver was co-indictee Demarco Alexander,

who told him "he was there visiting with his aunt, [even though] the house you could tell was definitely a vacant house. . . . An interview with [Alexander led police] to a subject by the name of Derrick Smallwood," which in turn led police to defendant.

Subsequently, police executed a search warrant for the residence of defendant, where they "recovered a firearm, and when [police] recovered that firearm [under the cushion of the couch in the living room] and showed it to [defendant] he immediately made a spontaneous utterance and stated that, 'That gun belongs to Demarco Alexander.' That's how [defendant] was tied into the armed robbery investigation. . . . [Defendant] was *Mirandized* on the scene at his house and . . . stated that he was aware of the location of items that were taken in the armed robbery at Brookstone." In a subsequent recorded statement, defendant admitted being in Alexander's car during the robbery of Stephanie Knox at the Brookstone apartments but denied any active participation. Although defendant denied obtaining any benefit from the specific robbery of Knox, he also admitted he shared marijuana with Alexander bought from the proceeds of other robberies. "After giving [police] the statement[, defendant] took [police] directly to the locations of where he remembered the armed robberies taking place." Other evidence indicated that, after the March 31, 1996, robbery at the Windjammer apartments, the robber (presumably Alexander) "got into the [passenger side] of the [gray] Omni [with Florida tags], he ducked down and the car pulled off [onto] Riverdale Road." That is, Alexander had a driver as an accomplice.

After the jury verdicts as to Counts 6 through 11, defendant entered a negotiated "Guilty [plea] on Counts 1-5." Defendant appeals directly from the judgment of conviction and sentence entered by the trial court on the jury's single guilty verdict on Count 2 (formerly Count 7). *Held*:

1. The second enumeration contends the trial court erred in admitting into evidence defendant's custodial statements both written and oral, arguing they were improperly induced by the police. The trial court made a pre-trial determination that defendant's statements were voluntary, before a transcript of defendant's taped interview was produced in response to the poor audio quality of the audiotape. Subsequently, the transcript raised new doubts as to the correctness of that ruling. Defendant renewed his challenge to the voluntariness of his statements and moved to strike them as evidence. Specifically, defendant points to exhortations by Detective Reed Pollard of the Clayton County Police Department that "once you get it off your chest then we [the detectives] can go to bat for you"; and repeated references that "the Judge is gonna consider that [defendant was admitting his mistakes;] the Judge needs to see that you are sorry and you are willing to take responsibility for your mis-

take[;] the Judge is going to take into consideration, you've got [only four weeks] before [defendant] can get [his] GED." The trial court declined to alter its pre-trial ruling as to voluntariness and this evidentiary ruling is enumerated as error.

(a) At the pretrial hearing conducted pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908), the State showed that defendant was warned of his rights as prescribed by *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694), at his home. "Once [defendant] was *Mirandized* he was very cooperative and he told [the police] that he could help [them] recover the purse that was taken in the armed robbery that was under investigation. After he [led the police] to the location and that purse, [the police] conducted an interview at College Park CID precinct, of which [defendant] confessed to being present during four armed robberies with Demarco Alexander and he gave [police] that confession on tape and also . . . [in] a written confession." Detective Hill made no deal with defendant "as far as any lenience" but did explain to defendant "that the only thing that law enforcement is allowed to do is make the court or district attorney aware of [defendant's] cooperation. And it was . . . stated plainly that we [the police] cannot tell him [defendant] what the district attorney or court would decide, that only we can make them aware that they [suspects generally] cooperated and that we [the police] could not make any promises or threats." State's Exhibit 12 is a "WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY," signed by defendant, which recites in part: "No threats or promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to the officers."

In contrast, defendant testified that, "prior to the tape recording of [his] statement was when [Detective Hill] first initiated, 'Look, we need to wrap this up. Will you cooperate with us? We need cooperation. Then I [Detective Hill] will go to the DA and I will talk to the judge and I will tell them that you cooperated and I will talk on your behalf, . . . as for a lesser crime.' That's when he [Detective Hill] started making the promises of leniency before he actually cut the tape recorder on."

The trial court found that defendant's "statement was freely and voluntarily given without any hope [sic] for punishment or hope for reward and will be admitted."

"The burden is on the prosecution to show the voluntariness of a custodial statement by a preponderance of the evidence. *High v. State*, 233 Ga. 153 (1) (210 SE2d 673) (1974). 'Factual and credibility determinations of this sort made by a trial judge after a (voluntariness) hearing must be accepted by appellate courts unless such determinations are clearly erroneous. (Cits.)' *Johnson v. State*, 233 Ga. 58 (209 SE2d 629) (1974)." *Wilson v. State*, 211 Ga. App. 457 (1)

(439 SE2d 685). In the case sub judice, the evidence at the pre-trial *Jackson v. Denno* hearing was conflicting as to whether Detective Hill promised defendant any form of leniency. Since Detective Hill's denial of any *initial* promise of leniency is corroborated by the transcript of defendant's custodial interview, the trial court's *pre-trial* determination of voluntariness "is supported by evidence, is not clearly erroneous, and will not be disturbed on appeal. *Wilson v. State*, 211 Ga. App. 457 (1)[, supra]." *Leatherwood v. State*, 212 Ga. App. 342, 343 (2) (441 SE2d 813).

(b) But the trial court's subsequent reasoning that it could not reconsider its previous ruling, in response to a renewed challenge to voluntariness based on additional evidence, is erroneous. "The denial of a pre-trial suppression motion, an interlocutory evidentiary ruling, is subject to review by the presiding judge ex mero motu. [Cit.] 'The trial court may, within its sound discretion, consider anew a suppression motion previously denied. (Cits.)' [Cit.]" *State v. Hall*, 229 Ga. App. 194, 195 (2), 196 (2) (a), 197 (493 SE2d 718). The question now becomes whether the transcript of the custodial interview shows error in the admission of defendant's statements.

(c) That transcript contains defendant's affirmation that he was, in fact, not *induced* to make his statement because of any threats or promises of leniency, and the record affirmatively shows there was no express promise of leniency. See *Lyles v. State*, 221 Ga. App. 560, 561 (1) (472 SE2d 132). Yet, defendant argues the repeated blandishments invoking the authority of a judge are implicit promises of leniency.

According to the transcript, defendant was again read his rights. He affirmed he understood those rights and agreed to make a statement without the benefit of counsel, expressly avowing that "no threats or promises have been made to [defendant] to induce [him] to sign the waiver of counsel [and] to make statements to the officer."

Defendant then explained he was riding with Demarco Alexander on April 16, 1996, when Alexander "pulled over in Brookstone and saw a lady getting out of the car, he kept driving down and parked the car on down a ways, he jumped out and walked towards (unintelligible) and [defendant] stayed in the car, [Alexander] said I'll be right back (unintelligible). . . . [Defendant] just stayed in the car, he [Alexander] was gone for about three or four minutes when he came back he was walking like this (obviously some gesture) (unintelligible). . . . He came back to the car and we drove off. . . . We had a gun while we were driving (unintelligible) he had it on me (unintelligible) he dropped me off at the house (unintelligible) that's how I got it."

Having thus admitted that he kept and hid the gun after the robbery of Ms. Knox, defendant then became lachrymose. The following

then transpired: "[DETECTIVE REED POLLARD]: You're doing great so far, real great . . . let's get everything behind you, (unintelligible) about another one, too, you also know about a lot more and I know its [sic] hard, but you're admitting your mistakes *and the Judge is gonna consider that, Right.* . . . [DEFENDANT]: (Makes a crying sound) . . . [DETECTIVE POLLARD]: (Unintelligible) and that's what *we were talking about the Judge needs to see that you are sorry* and you are willing to take the responsibility for your mistake. . . . [DEFENDANT]: (Unintelligible). . . ."

Subsequently, the following transpired: "[DETECTIVE POLLARD]: [W]hen we get through all of this we can talk to your aunt and tell her that you were a responsible, that you were a responsible adult that owned up to his mistakes and accepted the responsibility, *the Judge is going to take that into consideration,* you've got how long before you can get your GED? [DEFENDANT]: Four weeks. [DETECTIVE POLLARD]: Four weeks? Well that shows that you're doing good, O.K., *That is something the Judge is going to take into consideration,* that you, that you're out there trying. [DEFENDANT]: (Sniffle)"

Defendant calmed down and related his involvement in three other armed robberies, at the Huntington Woods, North Castlegate, and Lake Regency apartments.

"To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-3-50. "The fact that a confession has been made under a spiritual exhortation, a promise of secrecy, or a promise of collateral benefit shall not exclude it." OCGA § 24-3-51. "[A] hope of lighter punishment (induced by one other than the defendant) is usually the 'hope of benefit' to which Code Ann. § 38-411 [now OCGA § 24-3-50] refers ([cits.]), and that [in the case sub judice, Detective Pollard's implied promises] to tell the judge of [defendant's] cooperation, did not constitute the kind of 'hope of benefit' which is contemplated by Code Ann. § 38-411 [now OCGA § 24-3-50]. The trial court did not err in overruling the [renewed] motion to suppress [defendant's custodial statements] or in admitting the confession. [Cits.]" *Presnell v. State,* 241 Ga. 49, 55 (5) (243 SE2d 496), rev'd in part on other grounds, *Presnell v. Georgia,* 439 U. S. 14 (99 SC 235, 58 LE2d 207).

2. In the first and third enumerations, defendant challenges the sufficiency of the evidence, arguing he was merely present at the scene.

Mere presence at the scene of the commission of a crime is not sufficient to convict a witness of being a party to the crime. But presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent

may be inferred. *Jones v. State*, 242 Ga. 893 (1) (252 SE2d 394).

Evidence that Demarco Alexander's companion, the driver of the gray Dodge Omni with Florida tags, was a willing accomplice in the March 31, 1996 armed robbery at the Windjammer apartments, when coupled with defendant's after-the-fact knowledge of the hiding place of Ms. Knox's belongings; defendant's possession of the gun; and his admission he shared in the proceeds of other robberies, is sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) to authorize the jury's verdict that defendant is guilty, beyond a reasonable doubt, as an aider and abettor of the April 16, 1996 armed robbery alleged in Count 7 (renamed Count 2) of the indictment. *Butler v. State*, 194 Ga. App. 208 (2), 209 (390 SE2d 278); OCGA § 16-2-20 (b) (3).

*Judgment affirmed. Blackburn and Eldridge, JJ., concur.*

DECIDED MARCH 13, 1998.

*Barbara B. Briley*, for appellant.
*Robert E. Keller, District Attorney, Adrian Britt, Assistant District Attorney*, for appellee.