294 Ga. 798
FINAL COPY


S13A1786.  WRIGHT v. THE STATE.


HUNSTEIN, Justice.

Appellant Tyrone Wright was convicted of malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony in connection with the shooting death of Cedric Finley.  Wright appeals the denial of his motion for new trial and his conviction and sentence, asserting insufficiency of the evidence, improper denial of his motion to suppress, and ineffective assistance of counsel.  Finding no error, we affirm.[1]

---

[1] The crimes in this case occurred on January 5, 2009.  In February 2010, a grand jury in DeKalb County indicted Wright on one count each of malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.  In February 2011, the trial court denied Wright's motion to suppress, and the case proceeded to a jury trial.  On February 22, 2011, the jury found Wright guilty on all counts.  The court sentenced him to life imprisonment for malice murder and a consecutive five-year term for possession of a firearm during the commission of a crime.  All other counts merged or were vacated by operation of law.  Through trial counsel, Wright timely filed a motion for new trial on March 1, 2011, which, through new appellate counsel, was amended in December 2012.  The trial court held a hearing on February 13, 2013, and March 27, 2013, and denied Wright's amended motion for new trial on May 9, 2013.  On June 4, 2013, Wright filed a notice of appeal, which he subsequently amended on June 12, 2013.  Wright's appeal was docketed to the September 2013 term of this Court and was submitted for decision on the briefs.

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established the following. In early January 2009, Courtney Braddock stopped in Atlanta to buy crack cocaine on her way from Alabama to South Carolina. She approached the victim, Cedric Finley, and another male named Mike, neither of whom she had met before, and inquired about purchasing drugs. Finley and Mike took Braddock to a house where she could buy and use cocaine. While at this house, but before Braddock smoked crack cocaine, Wright approached Braddock and made disrespectful statements to her, such as suggesting that she have sex for crack cocaine and other demeaning requests. Wright was standing directly in front of Braddock, only a few feet from her. Finley and Braddock then consumed crack cocaine in a back room. When they returned to a front room, Finley, Braddock, and Mike were told to leave the house, which they did. After consuming crack cocaine again later that day, Finley and Mike dropped Braddock off at one of Finley's family member's homes. Braddock agreed to let Mike and Finley use her car while she stayed at the house. When Finley and Mike returned to the house where they had left Braddock, they had money and drugs in their possession. The three then traveled to another house where they smoked crack cocaine.

2

The next day, January 5, 2009, Braddock and Finley smoked crack cocaine early in the morning. Around 4:00 p.m., they drove Braddock's car to Shaquanda Brewington's house and parked the car in the driveway. They were at the house talking in the driveway for about two hours. During this time, Finley's nephew, Derek Scott, arrived and parked his car in the driveway behind Braddock's car. Finley told Scott that he had stolen cash and crack cocaine from someone the night before and that he was going to drive to South Carolina and get out of Georgia for awhile.

After talking with Scott for about an hour and a half, Finley asked Scott to move his car out of the driveway so that Braddock and Finley could leave in Braddock's car. Braddock and Finley got in Braddock's car, with Finley in the driver's seat and Braddock in the passenger seat. As Scott backed his car out of the driveway, two cars drove into the neighborhood and passed the house. The two cars then stopped, turned around, and parked in the driveway next to Brewington's home. Brewington went inside and called 911.

Scott saw several occupants exit the cars. The driver of one of the cars approached Scott carrying an AK-47 assault rifle and asked, "Where's the light-skinned n****r with the dreads?" Scott replied that he did not know who the

gunman was talking about, and the gunman started walking towards Brewington's house. As he approached the house, the gunman noticed Braddock's car in the driveway, and said, "There's Ced." He began shooting at the car, firing shots into the driver's side of the vehicle. Braddock, who had been looking in her purse, heard shots and looked up from the passenger seat to the left. She saw Wright with "a long, black gun pointed" in her direction, and she immediately took cover on the floorboard of the car. Although Finley was shot, he was able to put the car into reverse and back down the driveway. He crashed into Scott's car at the end of the driveway.

Scott kneeled down in his car when he heard the shots and did not see the shooter or any of the other individuals flee the scene. When the shooting stopped, he ran over to Finley and found him gasping for air. Scott called 911. Finley was taken to Grady Hospital, where he was pronounced dead on arrival. Among the items the police received from the trauma nurse that were on Finley at his death was Wright's Georgia driver's license. Additionally, a lead fragment recovered during an autopsy of Finley was consistent with having been fired from an AK-47 assault rifle.

Later at the police station, Braddock identified the shooter as Wright in a

4

written statement, having recognized him from the house the day before. She also picked Wright out of a photographic lineup. Scott also gave a statement to police describing the shooter and the man who had spoken to him. Scott had not seen the shooter before that evening. Scott also went to the police station to view a photographic lineup. He picked out two individuals from the lineup; one of them was Wright.

At trial, Braddock identified Wright as the shooter. Braddock testified that she was not high at the time of the shooting, her highs from using crack cocaine lasted approximately ten minutes, and she did not hallucinate while using crack cocaine. She remembered Wright's face from her interaction with him at the house the day before the shooting. She also testified that she had not used drugs since 2009.

Scott testified at trial that Wright was the gunman that had spoken to him that evening and shot Finley. Although Scott had picked out two men from the photographic lineup, he testified at trial that he was 95 percent certain that Wright was the shooter, he had seen Wright pull the trigger, and he witnessed the flash from the muzzle of the gun.

1. Wright argues that the evidence was insufficient to convict him

because there was no forensic evidence to connect him to the case and both Braddock and Scott were unreliable witnesses. Having reviewed the evidence, we find that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Wright was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); see also Vega v. State, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'") (citation omitted).

2. Wright argues that his due process rights were violated when the trial court denied his motion to suppress Scott's in-court identification of him. After a pre-trial hearing on Wright's motion to suppress, the trial court denied Wright's motion, finding that the photographic lineup and Scott's in-court identification were admissible, and it was for a jury to decide whether the lineup was impermissibly suggestive and whether there was a substantial likelihood of misidentification. "'On reviewing a trial court's ruling on a motion to suppress, evidence is construed most favorably to uphold the findings and judgment and the trial court's findings on disputed facts and credibility must be accepted

6

unless clearly erroneous.'" Scandrett v. State, 293 Ga. 602, 603 (2) (748 SE2d 861) (2013).

To determine whether a defendant's due process rights were violated by an admission of an in-court identification, the Court uses a two-step process. Gravitt v. State, 239 Ga. 709 (4) (239 SE2d 149) (1977). First, we must determine whether the identification procedure used was impermissibly suggestive. Id. If we find that it was indeed impermissibly suggestive, we next determine whether there was a substantial likelihood of irreparable misidentification in light of the totality of the circumstances. Id. We consider various factors in determining if there was a substantial likelihood of irreparable misidentification, including:

> (1) a witness' opportunity to view the accused at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the accused; (4) the witness' level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation.

Mathis v. State, 293 Ga. 837, 842 (5) (750 SE2d 308) (2013). "'In determining whether the trial court erred in denying the motion to suppress identification testimony, this court may consider the evidence adduced both at the suppression hearing and at trial.'" Clark v. State, 279 Ga. 243, 245 (4) (611 SE2d 38)

(2005).

The identification procedure used here was a photographic lineup. On the night of the shooting, Scott chose two suspects from the police photographic lineup, one of whom was Wright. Wright has not argued on appeal that the police's photographic lineup to Scott was impermissibly suggestive or that the evidence of the photographic lineup should have been excluded at trial. Instead, he contends that Scott's in-court identification should have been excluded because there was a substantial likelihood of irreparable misidentification. The evidence shows that Scott had a sufficient opportunity to observe Wright as Wright got out of the car, approached Scott's car, spoke to Scott for approximately fifteen seconds while standing at an arm's length distance from Scott's car door, and walked toward the house. Scott testified that he was able to see Wright's face when he spoke to him, and he heard Wright say, "There's Ced." Scott also saw an assault rifle in Wright's hands, Wright pull the trigger, and the flash from the muzzle of the gun. Scott testified that it was starting to get dark but that there was a street light illuminating the area. Regarding the accuracy of Scott's description of the gunman, on the night of the shooting, Scott described the gunman as a 6'2" or 6'4" black male, having a slim build,

weighing about 170-180 pounds, with a low or short haircut. Although Scott failed to note Wright's gold teeth or tattoos on his hands, his description of the gunman matched Wright, who testified at trial that he was 6'4 and ½" and weighed 180-183 pounds. Additionally, Scott testified that he was 95 percent certain that Wright was the gunman that spoke to him and fired the shots at Braddock's car. Under the totality of the circumstances, we conclude that there was not a substantial likelihood of irreparable misidentification.

Wright argues further that Scott's in-court identification was unreliable and should have been excluded because he was unable to definitively select Wright from the photographic lineup. Yet, Scott's failure to select only Wright from the lineup does not require the exclusion of Scott's in-court identification. Scott based his in-court identification of Wright on his personal observations of Wright from the night of the shooting and his face-to-face confrontation with him. Moreover, Scott testified that his identification of Wright was based on remembering Wright from the scene of the crime, not from seeing him in the photographic lineup. See Quijano v. State, 271 Ga. 181 (3) (516 SE2d 81) (1999) (eyewitness' failure to make a pre-trial identification of the defendant did not require exclusion of in-court identification because witness had face-to-face

9

confrontation with the defendant and observed him flee the scene, and the photographic lineup did not affect the witness' testimony); Jones v. State, 258 Ga. 25 (3) (365 SE2d 263) (1988) (in-court identification was reliable where the witness based his identification of the defendant on his observations from the scene of the crime rather than on a police show-up identification). Therefore, we conclude that Scott's in-court identification was reliable and the trial court did not err in denying Wright's motion to suppress.

3. Wright asserts that trial counsel provided ineffective assistance by failing to adequately prepare for trial and investigate the case. To establish ineffective assistance of counsel, a defendant must show that his trial counsel's performance was professionally deficient and that but for such deficient performance there is a reasonable probability that the result of the trial would have been different. Strickland v. Washington, 466 U. S. 668, 695 (104 SCt 2052, 80 LE2d 674) (1984); Wesley v. State, 286 Ga. 355 (3) (689 SE2d 280) (2010). To prove deficient performance, one must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Romer v. State, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). Courts reviewing

10

ineffectiveness claims must apply a strong presumption that counsel's conduct fell within the wide range of reasonable professional performance. Id. Thus, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course. Id. If the defendant fails to satisfy either the "deficient performance" or the "prejudice" prong of the Strickland test, this Court is not required to examine the other. See Green v. State, 291 Ga. 579 (2) (731 SE2d 359) (2012).

Wright asserts that trial counsel did not adequately investigate the case because he failed to interview Braddock before trial. At the motion for new trial hearing, trial counsel testified that both he and his investigator tried to speak with Braddock before the trial and she informed the State that she would not speak with the defense. This was confirmed by Braddock at trial, who testified during cross-examination that she refused to talk to defense counsel because she did not feel the need to do so and did not want to hurt the State's case. Thus, trial counsel's failure to interview Braddock was based on Braddock's refusal and unwillingness to speak with him, not on any deficient performance. See Rafi v. State, 289 Ga. 716 (3), n. 6 (715 SE2d 113) (2011).

Next, Wright contends that trial counsel could not have adequately prepared the case because he did not receive certain discovery. First, Wright asserts that trial counsel did not receive the police's photographic lineup shown to Scott. However, this claim is belied by the record, which reflects that trial counsel's motion to suppress was premised on the photographic lineup and the lineup was admitted into evidence at the suppression hearing. In addition, trial counsel testified at the new trial hearing that he reviewed the photographic lineup before trial and made notes to prepare for his cross-examination of Scott.

Second, Wright contends that trial counsel did not receive discovery regarding the contents of Finley's pockets. Trial counsel testified at the new trial hearing that he had received this discovery. Furthermore, at trial, defense counsel presented testimony from the trauma nurse at Grady Hospital about removing the contents of Finley's pockets, thereby showing that trial counsel was adequately prepared to discuss this discovery.

Third, Wright asserts that trial counsel did not receive discovery regarding the toxicology report from the medical examiner and he was inadequately prepared to cross-examine the medical examiner. Yet, trial counsel testified at the new trial hearing that he had actually seen the report before trial. He

12

explained that he discussed the toxicology report with a chemist from Emory University before trial and questioned the medical examiner about the report extensively at trial. Thus, we find that trial counsel's performance with regard to the handling of discovery was not deficient.

Next, Wright argues that trial counsel failed to investigate and develop evidence to show that Braddock's testimony was unreliable. Wright contends that trial counsel did not engage in a line of questioning with Braddock to show that a natural person's reaction would have been to turn away from the shooter, rather than look toward the shooter when she heard the shots, as Braddock had testified. Additionally, Wright asserts that trial counsel failed to undermine Braddock's testimony by investigating the position of the gunman in relation to Braddock. At the new trial hearing, trial counsel testified that he made the strategic decision to use testimony from the medical examiner about the trajectory of the bullets to show that Finley would have been in between Braddock and the gunman and that Braddock would not have seen the gunman, rather than obtaining his own forensic expert to investigate the trajectory of the

bullets.[2]  Moreover, at trial he questioned the medical examiner about Finley having cocaine in his blood at the time of his death to call into doubt Braddock's testimony that they had not consumed drugs since the morning of the shooting. He also questioned Braddock extensively about her cocaine addiction, the fact that at the time of the shooting she had not slept in 48 hours, her inaccurate description of Wright to the police, and how dark it was outside.  We find that this trial strategy was reasonable to call into doubt Braddock's credibility and does not constitute deficient performance.  See Brown v. State, 292 Ga. 454 (2) (738 SE2d 591) (2013) (decisions about which witnesses to call and rebutting opponent's evidence are matters of trial strategy and tactics).  Accordingly, we conclude that Wright has not shown that trial counsel rendered ineffective assistance.

Judgment affirmed.  All the Justices concur.

---

[2]Although at the new trial hearing the forensic expert presented by Wright testified that the shooter was moving from behind the car to the side of the car, his testimony was in line with the theory developed by trial counsel that Braddock could not have seen the shooter.

Decided March 17, 2014.

Murder. DeKalb Superior Court. Before Judge Scott.

Ashleigh B. Merchant, for appellant.

Robert D. James, Jr., District Attorney, Deborah D. Wellborn, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General. Ryan A. Kolb, Assistant Attorney General, for appellee.