NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 29, 2024

S24A0174. THOMAS v. THE STATE.

BETHEL, Justice.

This Court granted the interlocutory application of Tyler Jarel Thomas, who timely sought review of a trial court order that vacated its earlier grant of his motion to suppress. Thomas argues that the end-of-term rule, which we have held imposes a term-based time restriction on a trial court's authority over its interlocutory orders in criminal cases, should have barred the trial court's reconsideration, even though a new trial had been granted in his case. But for the reasons explained below, we conclude that Thomas's argument fails, so we affirm.

1. In February 2014, Thomas was indicted for the murder of Ashley Brown. Before his indictment, law enforcement executed a court order for Thomas's phone records, including cell site location

information (CSLI). At the time investigators obtained those records, access to them was governed by federal and state statutes. In 2014, while some federal courts held differently, "no appellate precedent binding in Georgia courts held that a request or demand by a governmental entity to a cell phone service provider that the provider produce its records related to a customer's account constituted a search under the Fourth Amendment" to the United States Constitution. *Lofton v. State*, 310 Ga. 770, 776 (854 SE2d 690) (2021). In other words, at that time in Georgia courts, a court order was legally sufficient to obtain records like the ones at issue here; a warrant was unnecessary.[1]

Nonetheless, Thomas moved to suppress the CSLI in June 2014, arguing that it was obtained in violation of the Fourth Amendment. The trial court agreed with Thomas and granted his

---

[1] This changed with the United States Supreme Court's decision in *Carpenter v. United States*, 585 U. S. 296 (138 SCt 2206, 201 LE2d 507) (2018), which held that compelling a cell phone service provider to turn over a user's historical CSLI of seven days or more constitutes a search under the Fourth Amendment and that, before such a search, "the Government's obligation is a familiar one—get a warrant." Id. at 317 (IV).

motion, relying in part upon *United States v. Davis*, 754 F3d 1205 (11th Cir. 2014) ("*Davis I*"), an Eleventh Circuit decision that held a warrant was necessary to obtain CSLI. But a year after it decided *Davis I*, the Eleventh Circuit reconsidered the case, reversing its position and holding that the Fourth Amendment to the United States Constitution did not require a warrant to obtain CSLI. See *United States v. Davis*, 785 F3d 498 (11th Cir. 2015) (deciding that a court order was sufficient to obtain CSLI from a service provider) ("*Davis II*").[2]

In May 2017, the day that voir dire was scheduled to begin, the State asked the trial court to reconsider its suppression order in light of the Eleventh Circuit's reconsideration of *Davis I*. Thomas argued that the end-of-term rule prohibited the trial court's reconsideration of the suppression order, even though the decisional law upon which the previous order relied had changed. While recognizing a change in the law underlying the suppression order,

---

[2] Neither *Davis I* nor *Davis II* were binding authority on the trial court, but the court looked to *Davis I* as "instructive" when granting Thomas's motion to suppress.

3

the trial court opined that the end-of-term rule, as articulated in *Moon v. State*, 287 Ga. 304 (696 SE2d 55) (2010), divested it of the authority to reconsider its own prior interlocutory ruling.

At trial, the jury found Thomas guilty of malice murder and related crimes. He timely filed a motion for new trial, which was granted by the trial court. We affirmed the grant of a new trial on the grounds that the State had committed a *Brady* violation, see *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LEd2d 215) (1963), by failing to disclose a deal with a witness. See *State v. Thomas*, 311 Ga. 407 (858 SE2d 52) (2021) ("*Thomas I*"). On appeal, the State did not challenge, and this Court did not address, the trial court's ruling suppressing the CSLI evidence.

Upon remand to the trial court, the State again moved for reconsideration of the CSLI suppression order. Thomas, meanwhile, reprised his end-of-term rule argument. But this time, the trial court agreed with the State,[3] vacated the earlier suppression order, and

---

[3] By our count, the motion to reconsider was granted by the third judge overseeing this case; the first judge suppressed the evidence in 2014, and the second judge declined reconsideration before the 2017 trial.

held that the CSLI could be tendered at trial. In so holding, the trial court expressly rejected Thomas's argument based on the end-of-term rule, explaining that reconsideration of the evidentiary ruling was proper because "[t]here is no final judgment in this case," "questions of suppression remain ripe and open for reconsideration," "no appellate court has opined on the question of the admissibility of the CSLI in this case," and the CSLI issue "has remained within the breast of the trial court since the inception of this case." This appeal followed.

2. On appeal, Thomas argues, as he did below, that the end-of-term rule should have prohibited the trial court's reconsideration of its order on his motion to suppress. Subject to certain exceptions, which are not applicable here, we have said that the end-of-term rule limits "a trial court's inherent power to revoke interlocutory rulings" in criminal cases to the end of the term in which the ruling was entered.[4] *Kelly v. State*, 315 Ga. 444, 447 (883 SE2d 363) (2023)

---

[4] The parties, the trial court, and some case law occasionally conflate the end-of-term rule and the law of the case doctrine. The two are often present in

(quoting *Moon*, 287 Ga. at 304). Because the order on the motion to suppress in this case was reconsidered several years after the end of the term in which it was granted, Thomas contends that the trial court's reconsideration was improper. For its part, the State argues that the reconsideration was not improper, because there has been no final judgment in this case and we have also said that trial courts "retain[ ] broad discretion over interlocutory evidentiary rulings which may be modified at any time *until entry of final judgment*," not just until the end of the term in which they were entered. *Ritter v. State*, 272 Ga. 551, 553 (2) (532 SE2d 692) (2000) (holding that a trial court did not err by reconsidering an out-of-term interlocutory ruling after the declaration of a mistrial) (emphasis supplied). Thus, the issue before us is whether, after a new trial has been granted in

the same case and have related concepts, but they are distinct. The law of the case doctrine provides that appellate rulings are binding in all subsequent proceedings. See OCGA § 9-11-60 (h) ("[A]ny ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be."). While the law of the case doctrine is found in the Civil Practice Act, we have held that it applies in criminal cases, too. See *Roulain v. Martin*, 266 Ga. 353, 354 (466 SE2d 837) (1996). But the law of the case doctrine does not apply here, because no appellate court has ruled on the disputed motion to suppress.

a criminal case, a trial court is prohibited from reconsidering an interlocutory ruling that it entered in an earlier term.

In civil cases, the end-of-term rule has been explicitly curtailed by statute. See OCGA § 9-11-6 (c) ("The continued existence or expiration of a term of court in no way affects the power of a court to do any act or take any proceeding in any civil action which has been pending before it, except as otherwise specifically provided by law."). Compare OCGA § 15-1-3 (6)-(7) ("Every court has power . . . [t]o amend and control its processes and orders, so as to make them conformable to law and justice . . . before final judgment.").[5] But we

_____

[5] The State contends that OCGA § 15-1-3 (6)-(7), while not abrogating the common law end-of-term rule as explicitly as in the Civil Practice Act, implicitly abolished the rule's application to interlocutory orders in criminal cases because it grants courts the authority to "amend and control" their orders "until final judgment," as opposed to limiting that authority to the term in which an order was entered. Id. But see *Crowell v. Crowell*, 191 Ga. 36 (11 SE2d 190) (1940). Indeed, if that is an accurate reading of the statute, our persistent application of this common law rule has been in error, because we are only bound to follow the common law if it has not been superseded by statute. See OCGA § 1-1-10 (c) (1); *Moon*, 287 Ga. at 305 (Nahmias, J., concurring) (explaining that the end-of-term rule, "which comes from the pre-Revolution English common law, seems outdated, but this Court probably lacks the authority to change it," because our Code requires us to follow the English common law unless otherwise displaced by law). If the State is correct, OCGA § 15-1-3 (6)-(7) permits trial courts to revise their own rulings, even those rendered in an earlier term, as long as that revision occurs before final

have continued applying the end-of-term rule in criminal cases, even to interlocutory orders. See, e.g., *Moon*, 287 Ga. at 304; *Hipp v. State*, 293 Ga. 415, 417 (746 SE2d 95) (2013).

We have consistently held, however, that when a new trial has been granted, trial courts are not prohibited from reconsidering their previous orders. See, e.g., *Smith v. State*, 292 Ga. 620, 622 (3) (740 SE2d 158) (2013) (citing *Ritter*, 272 Ga. at 553) (holding that, upon remand, a trial court is not "required to rehear all pretrial motions as though they had never before been considered," but that it has the authority to do so); *Salisbury v. Grimes*, 223 Ga. 776, 778 (158 SE2d 412) (1967) ("When appellant [is] granted a new trial, it wipe[s] the slate clean as if no previous conviction and sentence had existed."). Under the reasoning of *Ritter* and *Smith*, therefore, because the final judgment in this case was vacated by the grant of a new trial, the trial court may reconsider rulings from earlier terms.

---

judgment. But because this case may be resolved by reference to existing precedent, we do not reach this issue.

Thomas resists this conclusion, arguing that the end-of-term rule's application should not be limited by the grant of a new trial. Rather, he would have us hold that, upon remand following our decision in *Thomas I*, his case reverted to the posture it occupied the moment before his trial began, with all prior rulings intact and the trial court lacking authority to reassess them. Under Thomas's view of the end-of-term rule, the trial court would be prohibited from revisiting its earlier suppression ruling because that ruling was entered years before its reconsideration. In support of this contention, Thomas asserts that *Ritter* and *Smith* are unsound and should be considered with "caution." He does not argue that we should overrule those cases; instead, he asserts that *Ritter*'s precedential value should be "limited" because, he says, the cases it relies upon do not support its ultimate conclusion. Thomas also argues that *Ritter* should not be followed because of its apparent tension with *Moon*, *Ritter* permitting reconsideration of interlocutory rulings before entry of final judgment, see *Ritter*, 272 Ga. at 553 (2), and *Moon* broadly holding that "a trial court's

9

inherent power to revoke interlocutory rulings . . . ceases with the end of the term," *Moon*, 287 Ga. at 304.

Thomas's criticism of the decisional law upon which *Ritter* relied—specifically, *Tucker v. State*, 231 Ga. App. 210 (498 SE2d 774) (1998), and *Bradley v. Tattnall Bank*, 170 Ga. App. 821 (318 SE2d 657) (1984)—is unfounded. *Tucker* principally concerned the evidentiary-posture exception to the end-of-term rule,[6] and Thomas argues that *Tucker*'s applicability should be limited to that exception. But *Tucker*'s broad language was derived from a Court of Appeals decision that contemplated much more than the evidentiary-posture exception. See *State v. Hall*, 229 Ga. App. 194, 197 (493 SE2d 718) (1997) (holding that "[t]he denial of a pre-trial

---

[6] We have held that this exception to the end-of-term rule "allows after-term reconsideration, at least of constitutional issues, where the 'evidentiary posture' of the issue has changed." *Moon*, 287 Ga. at 309 (Nahmias, J., concurring). There is also an evidentiary posture exception to the law of the case doctrine. See, e.g., *Williams v. State*, 277 Ga. App. 841 (627 SE2d 808) (2006); *Collins v. Carr*, 116 Ga. 39, 40 (42 SE 373) (1902). In their briefing, the parties confuse the exceptions to these two rules, citing cases that apply both. We have not had occasion to examine the application of the evidentiary-posture exception to the end-of-term rule in the context of a substantive change in evidentiary decisional law and because this case can be disposed of on other grounds, we do not do so here.

10

suppression motion, an interlocutory evidentiary ruling, is subject to review by the presiding judge [on his own motion]"). Thomas takes issue with *Bradley*, meanwhile, because it was a civil case, not a criminal case like *Ritter* and the one at hand. But as we pointed out in *Ritter*, the general legal principle espoused in *Bradley* has been extended to criminal cases, too. See *Ritter*, 272 Ga. at 553 (2) n.3. Thomas's objection to these cases on the grounds that they do not support *Ritter*'s conclusion, therefore, is meritless.

Any arguable tension between *Ritter* and *Moon* may be resolved by examining their differing procedural postures. In *Moon*, no new trial had been granted. But new trials had been granted in *Ritter* and *Smith*, as in this case, materially distinguishing them from *Moon*. Importantly, Thomas has not directed us to a case in a similar procedural posture where *Moon* was applied to curtail a trial court's plenary authority over its own evidentiary rulings. Thus, the procedural posture of this case being more similar to *Ritter* and *Smith* than to *Moon* and its progeny, we conclude that the *Ritter* line of cases controls the analysis, and that the trial court did not err by

11

reconsidering its earlier order on Thomas's motion to suppress.[7]

*Judgment affirmed. All the Justices concur.*

---

[7] As a practical matter, mechanical application of *Moon*'s common-law interpretation in the procedural posture present here could create logistical impossibilities upon remand. For example, such an inflexible rule could force trial courts to adhere to the first trial's scheduling order, even if that would require jury selection to begin the day that the court received the remittitur. Or, as in this case, it could bind a trial court to an erroneous ruling excluding evidence with no legal basis for that exclusion. In the inverse, strict adherence to *Moon*'s rule could even convince a trial court to allow the admission of evidence in violation of the defendant's constitutional or statutory rights.

BETHEL, J., concurring.

I, of course, concur in the majority opinion. But I write separately to share a few observations about the end-of-term rule that we did not consider above. Where our Constitution and Code are otherwise silent, Georgians have elected to be governed by the common law of England as it existed on May 14, 1776. See OCGA § 1-1-10 (c) (1); *Lathrop v. Deal*, 301 Ga. 408, 412 (II) (A) n.9 (801 SE2d 867) (2017) ("In 1784, our General Assembly adopted the statutes and common law of England as of May 14, 1776, except to the extent that they were displaced by our own constitutional or statutory law. That adoption of English statutory and common law remains in force today." (citation omitted)). The end-of-term rule is a creature of that common law. However, our prior iterations of the rule might have caused us to apply it in a manner that is neither contemplated nor compelled by the common law.

Where we have held that the end-of-term rule, as articulated by the common law of England, prohibited judges from reconsidering interlocutory rulings outside of the term in which they were entered,

13

I fear that we may have erred. In the appropriate case, I would welcome the opportunity to revisit the actual metes and bounds of the historical end-of-term rule. For the reasons outlined in the opinion of the Court, this is not that case. But if and when we are called upon to revisit the end-of-term rule, our analysis must begin with an examination of English common law texts from the relevant time period.

The end-of-term rule has existed in some form for centuries, and it appears to find its origin in the practice of enrolling all *final* judgments at the end of a term. As Blackstone explained, after trial and verdict, "[i]f judgment [was] not by some [proper] means arrested within the first four days of the next term after the trial, it [was] then to be entered on the roll or record." 3 William Blackstone, Commentaries on the Laws of England 395 (1st ed. 1768) ("Blackstone's Commentaries"). See also Francis Bacon, Ordinances Made by the Right Honourable Sir Francis Bacon (1642), reprinted in Lord Bacon's Law Tracts 287 (2d ed. 1741) ("Bacon's Law Tracts") (explaining that "within two or three days after every term," a trial

14

court's final decrees were "granted at the rolls"). A final judgment was eligible for enrollment once "all issues [had been] tried and settled, [ ] all references to the matter ended," and the judgment had been signed by the judge or chancellor who oversaw the case. Blackstone's Commentaries 453-454. See also *Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co.*, 72 F. 545, 554 (6th Cir. 1896) ("Under the English practice, a decree was not in strictness regarded as final until enrolled, because until then it was liable to be altered by the court itself," but after "it was regarded as a final decree," it was "entitled as of course to enrollment.").

Once a final judgment was enrolled and the term had ended, the trial court no longer had the authority to modify that judgment. See *Short v. Ed. Kellogg & Co.*, 10 Ga. 180, 182 (1851) (explaining the "English rule" that "[a]t the Common Law, no judgment was amendable after the term at which it was entered"); *Winslow v. Staab*, 242 F. 426 (2d Cir. 1917) ("The technical rule of the English courts is that it is the enrollment of the decree which places it beyond the control of the court."). In courts of chancery, for example,

15

after a term had ended and a final decree had been enrolled, it could not be "reversed, altered, or explained . . . but upon bill of review" to a higher court. Bacon's Law Tracts at 279. See also Blackstone's Commentaries at 453 (explaining that after a decree was "signed and enrolled, it [could] not be reheard or rectified, but by a bill of review, or by appeal to the house of lords"). And a higher court's intervention was necessary because, after the end of the term in which a final judgment was entered, the trial court no longer enjoyed jurisdiction over the case. See *Bronson v. Schulten*, 104 U. S. 410, 417 (26 LEd 797) (1881) (explaining that the common law end-of-term rule "relates to the power of the courts, and not to the mode of procedure," and the relevant question is "whether there exists in the court the authority to . . . modify its *final* judgments after the term at which they were rendered") (emphasis supplied).

However, interlocutory orders were treated differently. When an order was "an interlocutory, not a final, one, there [were] neither technical nor substantial ground[s] for applying to it the rules pertaining to a bill of review," including the term-based limitations

on reconsideration. *John Simmons Co. v. Grier Bros. Co.*, 258 U. S. 82, 90-91 (42 SCt 196, 66 LE 475) (1922). See also *First National Bank v. Flershem*, 290 U. S. 504, 522 (54 SCt 298, 78 LE 465) (1934) ("[A] bill of review will not lie to review an interlocutory order."). An interlocutory order only required "a petition for rehearing," and because the order underlying such a petition was merely "interlocutory, the court at any time before final decree [could] modify or rescind it." *John Simmons Co.*, 258 U. S. at 90-91. See also *Kenon's Executors v. Williamson*, 2 N. C. 350, 352 (1796) (holding that at common law, a "bill of review [would lie] only upon a final decree enrolled," and that "[b]efore it [was] finally pronounced and recorded, any mistakes [could] be rectified by a rehearing");[8] *Ogle v.*

---

[8] North Carolina cases may have particular relevance because that state, too, follows the common law of England as it existed in 1776, unless otherwise displaced by law. See *Hall v. Post*, 323 N. C. 259, 264 (372 SE2d 711) (1988) ("Unless modified or repealed by the General Assembly or this Court, the 'common law' to be applied is the common law of England as it existed when North Carolina became a sovereign State in 1776."). As we have observed, while states "may place a different construction upon a principle of common law, that does not change the law." *Slaton v. Hall*, 168 Ga. 710 (148 SE 741) (1929). Because there is only one body of common law, there is "still only one right construction" of that law. Id. See also *Coon v. Med. Ctr., Inc.*, 335 Ga. App. 278 (780 SE2d 118) (2015) (McMillian, J., concurring specially). And while

*Lee*, 6 U. S. 33 (2 LE 198) (1804) ("A court may at any time reverse an interlocutory decree."); *Welch v. Kingsland*, 89 N. C. 179, 181 (1883) (reversing a trial judge who had refused to modify an interlocutory order entered in an earlier term "on the ground of a supposed want of power in the judge," because "[a]n interlocutory order . . . is always under the control of the court during the pending of the action").

In simpler terms, the common law seemed to treat the end-of-term rule as a jurisdictional limitation on trial courts. But I have found no suggestion that, as of May 14, 1776, trial courts in England were under a similar jurisdictional limitation with respect to their own interlocutory orders. Indeed, the authority I have been able to locate suggests the opposite. See, e.g., *Mills v. Banks*, 24 Eng. Rep. 943 (3 P. Wms. 3) (1724) (holding in equity that a trial court had

our Court's application of the common law is controlling in Georgia, "[i]f this Court is persuaded that the understanding of the relevant principle of the common law offered by the courts of [another] state (or of other common-law courts, for that matter) is superior to our own, we may adopt that position and apply it to the case at hand." *Coon v. Med. Ctr., Inc.*, 300 Ga. 722 (797 SE2d 828) (2017).

discretion to reconsider interlocutory decree entered eighteen years earlier); *Cavil v. Burnaford*, 97 Eng. Rep. 452 (1 Burr. 569, 2 Keny. 290) (1758) (holding that the "power to set aside interlocutory judgments, seems incident to justice," and "[t]here is no authority nor even dictum, to the contrary: nor is there any reason why [trial courts] should not have such a power").

Other authorities, including this Court's early decisions, also cast doubt on our more recent articulations of the end-of-term rule. See, e.g., *Langford v. Comms. Wilkinson County*, 75 Ga. 502, 503 (1885) (holding that, because until "final judgment in the superior court, the cause was in fieri," the court could "alter an interlocutory opinion . . . before final disposition"); *Wakefield v. Moore*, 65 Ga. 268, 270 (1880) (concerning judgments of contempt, "the court may review and annul its [contempt judgment] at the same or at a subsequent term"); *W. P. Love & Co. v. Young*, 69 N. C. 65, 66-67 (1873) (explaining that no "rule of law [forbode] his Honor, at Spring Term, 1873, from reconsidering an interlocutory order made at Fall Term, 1872," and that if the judge "became satisfied, that . . . the

19

case was not properly constituted before him, it was his duty to dismiss the proceeding, notwithstanding he at Fall Term, 1872, failed to take the same view of the case"); *United States v. 111,000 Acres of Land in Polk & Highlands Counties, Florida*, 155 F2d 683, 685 (5th Cir. 1946) (explaining that the common law "was well settled that, while during the term of the court all its judgments are 'in the breast of the court' and subject to its control, after the term ends the final judgments, as distinguished from interlocutory ones, cannot be altered").

So, what precipitated our apparent deviation from this seemingly settled law? Upon review of our opinions, I believe the rule as we have articulated it began to take shape in *McCandless v. Conley*, 115 Ga. 48, 50-51 (41 SE 256) (1902). There, we broadly stated that "[t]he mere fact that a cause is still pending, no final judgment on the merits having been rendered, does not preserve in the court power to revoke interlocutory rulings made at a term which has passed." Id. To support this iteration of the end-of-term rule, we cited Henry Campbell Black's *Treatise on the Law of*

20

*Judgments* (1891) ("Black's Treatise"); *McCaulla v. Murphy*, 86 Ga. 475, 481 (12 SE 655) (1890); *Dyson v. Southern Rail Co.*, 113 Ga. 327, 330 (38 SE 749) (1901); *Watkins v. Brizendine*, 111 Ga. 458 (36 SE 807) (1900); and *Cralle v. Cralle*, 84 Va. 198 (6 SE 12) (1887). But I cannot make out how any of those authorities support the proposition for which we cited them.

In support of our holding in *McCandless*, we cited Black's Treatise, which said, among other things, that "[d]uring the term the record is said to be in the breast of the judge; after it is over it is upon the roll." *McCandless*, 115 Ga. at 51 (quoting Black's Treatise at §§ 153, 154, and 157). But, as explained at length above, only *final* judgments that were "upon the roll" carried term-based time limits on their reconsideration.[9] Moreover, § 308 of the very same volume

---

[9] Indeed, not long after *McCandless*, we recognized that, while a certain order "may be in its nature a judgment, it belongs to that class of judgments usually designated as interlocutory orders, and has none of the elements of a final judgment." *Field v. Peel*, 122 Ga. 503, 505-506 (50 SE 346) (1905). We even explained that "[t]he entry of a final judgment terminates [a court's] jurisdiction of the controversy, but an entry of an interlocutory order does not have this effect, and such an order is subject to be vacated [ ] whenever sufficient reason is shown therefor." Id. at 506.

of Black's Treatise explicitly exempts interlocutory orders from end-of-term finality. See Black's Treatise at § 308 (explaining that "[a]n interlocutory judgment or decree, made in the progress of a cause, is always under the control of the court until final decision of the suit, and it may be modified or rescinded, upon sufficient grounds shown, at any time before final judgment, though it be after the term in which the interlocutory sentence was given").[10]

Neither do the cases that we cited support the proposition that trial courts are bound by their own interlocutory orders after term-end. *Watkins* did not address interlocutory orders at all; it concerned

---

[10] Other prominent legal scholars around the time of *McCandless* echoed Black's view. See, e.g., 1 Abraham Clark Freeman, Treatise on the Law of Judgments 391, § 200 (5th ed. 1925) ("Any merely interlocutory order or judgment may be vacated at a term subsequent to that at which it was entered. The general rule limiting the power to modify or vacate, to the term, applies only to final judgments and decrees and hence does not prevent such action where only a written opinion has been filed which is apparently not intended as a final decree."); 17 Am. & English Encyclopaedia of Law 817-818 (2d ed. 1900) (The "well established" and "general" rule prohibiting amendment of judgments after the expiration of the term at which they were rendered "applies only to final judgments, and has no application to a judgment or order which does not put an end to the proceedings, but leaves them in fieri, as in the case of an interlocutory judgment[.]"); John Lilly, Practical Register: Or a General Abridgement of the Law 70 (2d Ed. 1735) (explaining that judges were empowered to "amend a Judgment, though of another Term").

the reinstatement of a case after a final judgment had been entered in an earlier term and, for that reason, seems to fit easily into the category of "enrolled" final decisions for purposes of the common law end-of-term rule. See 111 Ga. at 460. *Cralle* applied the law of the case doctrine, not the end-of-term rule, and was therefore irrelevant to the issues under consideration in *McCandless*. See 84 Va. at 198 (holding that a trial court could not reconsider part of a judgment that had been affirmed on appeal). *Dyson*, meanwhile, concerned amendments to the pleadings in a situation unrelated to terms of court. See 113 Ga. at 330. And *McCaulla* construed a statutory deadline for filing a demurrer. See 86 Ga. at 481.

In later cases where we have discussed the end-of-term rule, we have uncritically cited *McCandless* as standing for the common law proposition that interlocutory orders cannot be modified outside of the term in which they were entered, failing to grapple with the common law history or *McCandless*'s misplaced reliance upon its

cited authorities.[11] See, e.g., *Lemcon USA Corp. v. Icon Tech. Consulting, Inc.*, 301 Ga. 888 (804 SE2d 347) (2017) (citing *Moon*, 287 Ga. at 304, 305 (citing *McCandless* and Black's Treatise as supporting the proposition that at common law, interlocutory orders could not be modified after term-end)). But our Code binds us to follow the English common law, not our own potentially errant interpretation of that common law. Thus, if in a future case where the issue is properly presented, we determine that our understanding of the common law end-of-term rule is incorrect, we will be compelled to engage in a stare decisis analysis to determine whether that incorrect articulation must continue. Today is not that day.

---

[11] Two notable exceptions to this trend include *Ritter v. State*, 272 Ga. 551, 553 (2) (532 SE2d 692) (2000), and *Smith v. State*, 292 Ga. 620, 622 (3) (740 SE2d 158) (2013), both of which viewed the common law as allowing trial courts to modify their interlocutory rulings and orders before final judgment.