**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: January 28, 2025

S24A1357. SINGLETON v. THE STATE.

COLVIN, Justice.

Appellant Raiem Singleton appeals his convictions for malice murder and other crimes related to the shooting death of Luz Selene Velazquez and the aggravated assault of David Montes-Ponce.[1] On

---

[1] The crimes occurred on May 5, 2017. On August 3, 2017, a DeKalb County grand jury indicted Appellant for malice murder (Count 1), felony murder (Count 2), the aggravated assaults of Velazquez and Montes-Ponce (Counts 3 and 4, respectively), and possession of firearm during commission of a felony (Count 5).

Following a jury trial which was held from February 5, 2018, through February 9, 2018, the jury found Appellant guilty on all counts. The trial court sentenced Appellant to life in prison for malice murder (Count 1), vacated Appellant's felony murder charge (Count 2) by operation of law, and merged Appellant's charge for aggravated assault of Valezquez (Count 3) into Count 1. The trial court sentenced Appellant to fifteen years in prison for the aggravated assault of Montes-Ponce (Count 4), to run concurrently with Count 1, and five years for possession of a firearm during the commission of a felony (Count 5), but the court suspended this sentence.

On March 20, 2018, Appellant moved for new trial. Appellant then filed a series of amended motions for new trial with different counsel, concluding with his fourth amended motion for new trial on September 22, 2023. Following a hearing on March 27, 2024, the trial court denied Appellant's motion, as

appeal, Appellant argues that the trial court abused its discretion by denying his motion to suppress identification evidence arising from a photo lineup in which Montes-Ponce selected Appellant's photograph. For the reasons below, we affirm.

1. The trial evidence showed the following. On May 5, 2017, Montes-Ponce and his wife, Velazquez, used a mobile phone application to shop for phones posted for sale by individuals in their area. After identifying a suitable phone, Montes-Ponce messaged a seller whose username was "Tom Li" to arrange a meeting to purchase the seller's iPhone. The Tom Li account provided Montes-Ponce with an address to an apartment complex in DeKalb County.

When Montes-Ponce and his wife arrived at the address, Montes-Ponce messaged the Tom Li account, and the seller came out of the apartment building. Two other men accompanied the seller outside. Montes-Ponce and the seller continued to message each

amended, on April 11, 2024. Appellant filed a timely notice of appeal on May 13, 2024. Appellant's appeal was docketed to the August 2024 term and was submitted for a decision on the briefs.

other, and Montes-Ponce could see the seller typing on his phone. **«V6-67»** Though it was getting dark, there was still enough light for Montes-Ponce to see the seller's face. Montes-Ponce got out of his car and approached the three men near the steps to the apartment building. Montes-Ponce asked to see the phone, but it would not turn on when the seller showed it to him. According to Montes-Ponce, the seller then said, "I'm not going to rob you or do any harm to you," and shook his hand. Montes-Ponce walked back to the car where Velazquez was waiting, and she told him that they should leave if the phone did not work. The seller then offered to see if he had a charger on site and ran upstairs to retrieve it.

According to Montes-Ponce, when the seller came back down the stairs, he asked Montes-Ponce to wait for his "brother" who was on his way with the charger. Instead, Montes-Ponce walked back to his car and started it, only to be followed by the seller and one of the other two men with him. The two men approached the driver-side window of the car where Montes-Ponce was sitting. The seller attempted to force the door open before stepping back and firing a

3

gun toward Montes-Ponce's car.

In describing the shooting, Montes-Ponce said that it was as if "time had stood still," and he recalled seeing the "light" from the gunshot. Montes-Ponce heard his window shatter, pushed his wife back toward her seat, and quickly put his car in reverse to leave when his wife told him that she had been shot. All three men fled from the scene, but Montes-Ponce did not see where they went.

Velazquez died shortly after, and at trial, Montes-Ponce identified Appellant as the seller who fired the shots. Jakerius Henry — who was friends with Appellant at the time of the shooting — testified that he was one of the two people with Appellant at the apartment complex on the evening of the crime, and that he witnessed Appellant draw a gun and shoot through Montes-Ponce's car window.

After the shooting, Montes-Ponce told personnel with the DeKalb County Police Department that he had communicated with the seller through a mobile phone application, prompting the department to subpoena the application's company for records

4

related to the Tom Li account and an associated phone number the account had provided Montes-Ponce. An investigator from the company connected the Tom Li account to the names "Raiem"— Appellant's first name — and "Jamel Harris."

With information from the company's investigation, the police department came to the belief that Harris owned the phone number that was given to Montes-Ponce by the Tom Li account. A photo lineup with Harris's picture was presented to Montes-Ponce; Montes-Ponce selected Harris's photograph, identifying him as one of the three men present at the scene; and an arrest warrant was obtained for Harris.

Authorities found Harris, Appellant, Henry, and a fourth person in an abandoned house on May 8, 2017. Appellant was arrested that same day, denied bond on July 5, 2017, and indicted by a grand jury on August 3, 2017. But Montes-Ponce was not shown a photo lineup containing Appellant's picture until September 18, 2017.

2. Appellant contends that the trial court erred in denying his

motion to suppress the identification evidence. We disagree.

"This Court employs a two-step process in examining a trial court's admission of identification evidence for error." *Bowen v. State*, 299 Ga. 875, 879 (4) (792 SE2d 691) (2016). Under the first step, we consider whether "the identification procedure used was impermissibly suggestive." Id. An identification procedure is impermissibly suggestive when it "is the equivalent of the authorities telling the witness, '[t]his is our suspect.'" *Westbrook v. State*, 308 Ga. 92, 99 (4) (839 SE2d 620) (2020) (citation omitted). If we conclude that the lineup was impermissibly suggestive, we move to the second step, which is to determine "whether there was a substantial likelihood of irreparable misidentification of the defendant in light of the totality of the circumstances." *Bowen*, 299 Ga. at 879 (4). We consider several factors when deciding whether there was a substantial likelihood of irreparable misidentification, including:

> (1) a witness' opportunity to view the accused at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the accused;

6

(4) the witness' level of certainty at the confrontation; and
(5) the length of time between the crime and the confrontation.

*Wright v. State*, 294 Ga. 798, 801-802 (2) 756 SE2d 513, 517 (2014) (citation omitted). Ultimately, even if an identification procedure is impermissibly suggestive under the first step, identification evidence should only be suppressed if there is "a substantial likelihood of irreparable misidentification." *Newton v. State*, 308 Ga. 863, 867 (2) (843 SE2d 857) (2020) (holding that the trial court did not err in denying a motion to suppress where, "[e]ven assuming that the photographic array was unduly suggestive, [the appellant] fail[ed] to show that there was a substantial likelihood of irreparable misidentification").

On appeal, "[w]e review a trial court's determination that a lineup was not impermissibly suggestive for an abuse of discretion." *Westbrook*, 308 at 99 (4). "[W]e construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." *State v. Hinton*, 309 Ga. 457, 457 (847 SE2d 188) (2020). And we "generally . . . accept the trial court's factual findings unless

7

they are clearly erroneous." *Westbrook,* 308 Ga. at 96 (2) (citation and punctuation omitted). "In determining whether the trial court erred in denying the motion to suppress identification testimony, this court may consider the evidence adduced both at the suppression hearing and at trial." *Clark v. State*, 279 Ga. 243, 245 (4) (611 SE2d 38) (2005) (citation omitted).

Evidence presented at the motion to suppress hearing showed the following. Sandra Trejos-Roman was employed with the DeKalb County District Attorney's Office and was tasked to support Montes-Ponce throughout the legal process and serve as his English-to-Spanish interpreter as he was primarily a Spanish speaker. Trejos-Roman testified that she first met with Montes-Ponce outside of a courtroom in May of 2017 and that she spoke with Montes-Ponce several other times by phone after their initial in person meeting, including on June 16 and June 20, 2017. On June 16, Trejos-Roman informed Montes-Ponce that a bond hearing was being set for June 23, and Montes-Ponce expressed his intent to attend. Trejos-Roman testified that the two spoke again on

June 20, 2017. Montes-Ponce then informed Trejos-Roman that he had been notified by a victim's notification program — which the District Attorney's Office had registered him for — that Jakerius Henry was being released. Montes-Ponce also restated his intent to attend the bond hearing scheduled for June 23. Appellant's bond hearing was ultimately rescheduled for July 5 of that year. Trejos-Roman did not attend the July 5 hearing and consequently did not know whether Montes-Ponce or any of his family were present, but she did call Montes-Ponce over the phone later that day to inform him of what happened at the hearing, based on information she received from the assistant district attorney who was there.

Investigator Randolph with the DeKalb County District Attorney's Office composed the lineup with Appellant's picture and presented it to Montes-Ponce more than two months after Appellant's bond hearing. In recounting what occurred, Investigator Randolph and Trejos-Roman, who was also present for the lineup, initially gave conflicting testimony as to how Montes-Ponce

identified Appellant's photograph. Investigator Randolph testified that Montes-Ponce stated, "You only have the person that shot my wife. This is the shooter. You do not have the two guys that were with him. I don't see these two guys in the photos." Contrarily, Trejos-Roman initially testified that Montes-Ponce identified Appellant by simply saying, "es este," meaning, "it's this one." But she eventually testified that she could not remember whether Montes-Ponce specifically said that Appellant was the shooter. At the conclusion of their testimonies, the trial court said that there were "issues" with Trejos-Roman's credibility. Trial counsel was offered the opportunity to call Montes-Ponce to the witness stand but declined. The trial court then denied Appellant's motion to suppress the identification evidence and rejected trial counsel's subsequent attempts to call the witness.

At trial, Montes-Ponce identified Appellant in court and testified about what occurred at the photographic lineup, including that he wrote on Appellant's picture from the lineup, "He fired at my wife the day of the incident." But neither the prosecution nor trial

10

counsel pressed Montes-Ponce on the issue of whether he saw Appellant at a hearing or knew of Appellant's name before the lineup. On the first day of trial, Montes-Ponce testified that he did "attend[ ] one court hearing," but that he was present for only "five minutes" and "no one told [him] anything." Counsel did not ask follow-up questions regarding what day Montes-Ponce was in court for the hearing or whether he saw Appellant while there. On the second day of trial, Montes-Ponce was asked whether the first day of trial was the first time he had seen Appellant since the crime. Montes-Ponce responded, "I saw him the day of my wife's murder and today and twice from yesterday and today as well." Neither the prosecution nor trial counsel asked Montes-Ponce to clarify his answer.

(a) Appellant makes several arguments as to why the photo-lineup procedure was impermissibly suggestive. But pretermitting whether the photo-lineup procedure was impermissibly suggestive, Appellant has not shown that there was a substantial likelihood of irreparable misidentification. Montes-Ponce had a significant

11

opportunity to view Appellant at the time of the crime. He testified that there was still some daylight left when he met with Appellant on the day of the shooting; that the two held a brief conversation and shook each other's hand; and that he had five minutes to look at Appellant and the other two men's faces. Moreover, Montes-Ponce remembered the incident in detail, testifying that he saw the flash coming from the gun because it was as if "time . . . stood still" for him. See *Wright*, 294 Ga. at 802 (2) (holding that there was not a substantial likelihood of irreparable misidentification where the evidence showed that the witness who identified the appellant from a lineup "had a sufficient opportunity to observe [the appellant] as [the appellant] got out of a car, approached [the witness's] car, [and] spoke to [the witness] for approximately fifteen seconds" at an arm's length distance moments before the witness saw the appellant pull an assault rifle trigger and saw a flash coming from the muzzle); *Semple v. State*, 271 Ga. 416, 418 (2) (519 SE2d 912) (1999) (holding that "even if" the identification procedure was impermissibly suggestive because the witness saw the appellant's picture on

television and saw the appellant with his counsel at a pretrial hearing prior to making an in-court identification, the trial court did not err in denying's the appellant's motion to suppress because there was no substantial likelihood of irreparable misidentification, given that the "crimes occurred under a street and light," the witness "saw them from a distance sufficient for reasonable acuity," and the witness also "observe[d] [the appellant] as [the appellant] ran towards him").

And though months had passed between the day of the crime and the photo lineup, evidence shows that Montes-Ponce professed a high degree of certainty in his selection. See *Wright*, 294 Ga. at 801-802 (2) (noting that a factor for consideration upon deciding on whether there exists a substantial likelihood of irreparable misidentification is "the witness' level of certainty at the confrontation" and that the witness's "95 percent certain[ty]" that the appellant was the shooter was one of several factors supporting the trial court's decision to deny the appellant's motion to suppress). Investigator Randolph testified at the motion to suppress hearing

13

that, after selecting Appellant's photo, Montes-Ponce said that he would "never forget it." And likewise, at trial, Montes-Ponce testified that he would "never forget what happened." See *Howard v. State*, 318 Ga. 682, 688-689 (2) (899 SE2d 669) (2024) (considering and giving significant weight to the certainty of the person who identified the defendant, while also giving great weight to the amount of time spent with that person before the crimes).

Appellant argues the trial court erred in admitting the identification evidence because the State was left "without proof" that Montes-Ponce identified Appellant as the shooter, "rather than as one of the other individuals present at the scene," because of "contradictions" between the testimony of Trejos-Roman and Investigator Randolph. Regardless of whether there was any inconsistency in the testimony of Trejos-Roman and Investigator Randolph, trial evidence showed that Montes-Ponce wrote on Appellant's photograph during the lineup, in Spanish, "He fired at my wife the day of the incident." Accordingly, Appellant's argument that the State lacked proof that Montes-Ponce identified Appellant

14

as the shooter fails.

For these reasons, the trial court did not abuse its discretion in denying the motion to suppress the identification evidence.

(b) At the end of his brief, Appellant briefly asserts that "the trial court abused its discretion" when it "reneged" on its initial conclusion that the State failed to "meet its burden" to show that the photo lineup was not impermissibly suggestive and "then refused to allow [Appellant's] counsel to call Mr. Montes-Ponce" at the motion to suppress hearing. This claim fails. To the extent that Appellant contends that the trial court abused its discretion by "reneg[ing]" on an evidentiary ruling, he is incorrect. Given that a trial court retains the authority to revisit a ruling such as this at least until the end of the term in which the ruling was made, it retains the authority to revisit a ruling on the same day, as was done here. *Thomas v. State*, 319 Ga. 123, 124-125 (2) (902 SE2d 566) (2024) ("Subject to certain exceptions . . . we have said that the end-of-term rule limits a trial court's inherent power to revoke interlocutory rulings in criminal cases to the end of the term in which the ruling was entered."

15

(citation and punctuation omitted)).[2] And Appellant makes no other argument as to why preventing Montes-Pontes from testifying was an abuse of discretion.

For the aforementioned reasons, the trial court did not err in admitting the identification evidence.

*Judgment affirmed. All the Justices concur.*

---

[2] Some of us have raised the question of whether the limitation on modification of rulings after the end of a court's term applies to interlocutory orders, or only to final judgments, but we need not resolve that issue here given that any modification of a prior ruling happened on the same day. See *Thomas*, 319 Ga. at 128-133 (Bethel, J., concurring).