319 Ga. 234
FINAL COPY

S24A0129. ELEBY v. THE STATE.

Boggs, Chief Justice.

Appellant Lekievius Eleby challenges his 2012 convictions for

felony murder and other crimes in connection with a home invasion

that resulted in the death of Danavan Bussey.[1] Appellant contends

---

[1] The crimes occurred on December 5, 2010. On March 16, 2011, a Lamar County grand jury indicted Appellant, Shameik Spinks, and Bryce Smith on multiple counts: Count 1 — the felony murder of Bussey (armed robbery); Count 2 — the felony murder of Bussey (aggravated assault); Count 3 — armed robbery; Count 4 — burglary; Count 5 — the aggravated assault of Tyrone Holmes; Count 6 — the aggravated assault of Dewayne Johnson; Counts 7, 8, and 9 — the false imprisonment of Keitrae Battle, Holmes, and Johnson; Count 10 — conspiracy to commit armed robbery; and Count 12 — tampering with evidence. Appellant was separately indicted in Count 13 for possession of a firearm during the commission of a felony, and Spinks was also separately indicted for the same offense. On January 5, 2012, before trial, Bryce Smith pled guilty to robbery by intimidation and received a sentence of 15 years in prison, with ten to serve, and testified against Appellant at trial. On February 27, 2012, before trial, Spinks pled guilty to felony murder. He testified for the defense at trial. At a trial from February 27 to March 6, 2012, a jury found Appellant guilty on all counts of the indictment.

On March 6, 2012, the trial court sentenced Appellant to life in prison for felony murder (armed robbery); to a concurrent sentence of life in prison for armed robbery; to fifteen consecutive years in prison for burglary; to fifteen concurrent years in prison for the aggravated assaults of Holmes and Johnson; to ten concurrent years in prison on the three false imprisonment counts; to ten concurrent years in prison for conspiracy to commit armed robbery; to ten concurrent years in prison on the tampering count; and to five consecutive

that the evidence was legally insufficient to support his convictions because the identifications of Appellant as one of the participants were not reliable; that the indictment was multiplicitous; that the trial court abused its discretion when it excluded evidence of past recollection recorded; that the trial court erred in failing to grant Appellant's motion to suppress certain pretrial and trial identifications; that the trial court committed plain error when it allowed a GBI agent to give her opinion about the meaning of certain text messages; that Appellant's sentences for the aggravated

years in prison on the possession count. The trial court merged Count 2 for sentencing purposes. On March 19, 2012, Appellant filed a motion for new trial, which he amended through new counsel on March 16, 2020. On August 2, 2023, the trial court denied the motion for new trial, as amended. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2023 and submitted for a decision on the briefs.

We note that there was a significant delay between the filing of Appellant's motion for new trial in 2012 and the filing of his amended motion in 2020. See *Everett v. State*, 318 Ga. 697, 698 n.2 (899 SE2d 699) (Ga. 2024) (stating that "[w]e are troubled by the inordinate and unexplained delay between the filing of Everett's motion for new trial in 2010 and the filing of an amended motion 12 years later"). Here, Appellant was appointed new counsel in 2013, but no substantive filings by that counsel appear in the record. In August 2019, Appellant retained current appellate counsel, who filed the amended motion for new trial in 2020.

assaults of Tyrone Holmes and Dewayne Johnson should have merged with each other or with the armed robbery offense; that the conspiracy to commit armed robbery should have merged with the conviction for armed robbery; that the possession offense should have been merged with felony murder; that the prosecutor made improper and prejudicial comments in his closing argument; and that his trial counsel was constitutionally ineffective for failing to make certain objections at trial. For the reasons that follow, we vacate Appellant's convictions and sentences for armed robbery and conspiracy to commit armed robbery. Appellant's remaining claims are not preserved for appeal, are without merit, or do not require reversal.

1. The evidence presented at trial showed that the victims — Bussey, Holmes, and Johnson — were friends who attended Gordon College together and lived in a house on Westchester Drive in Barnesville in December 2010. Appellant also lived on Westchester Drive. Johnson testified that he knew Appellant from "hanging around Barnesville" and that, although he did not "hang out" with

Shameik Spinks,[2] he had "seen him around." Likewise, Holmes testified that he had met Appellant at a club, had seen him around Gordon College and also knew him from the Westchester Drive neighborhood, but that, at the time of the crimes, he did not know his last name.

Before the crimes, there had been animosity between the victims and Appellant, with the victims thinking that Appellant had twice broken into their home. In September 2010, Bussey, who was with Johnson, confronted Appellant, who was with his cousin Spinks, about the break-ins. According to Johnson, this led to a fight between Bussey and Appellant, with Spinks also "trying to jump on [Bussey]." Johnson added that Bussey and Appellant threw some punches at each other and the fight "just ended." In addition, on the night of December 4, 2010, one night before the crimes at issue here, when the victims were driving down Westchester Drive, they saw Spinks walking down the street, pulled up next to him, and "had a

---

[2] Appellant testified that Spinks's "granddaddy and my father are first cousins" and Johnson and Holmes referred to Spinks as Appellant's cousin.

4

couple of words with him." Holmes testified that he asked Spinks about the fight with Bussey and that Spinks replied that he was "not going to fight"; "I'm going to shoot." The victims drove away.

In the early morning hours of December 5, 2010, the victims were having a party at which a few other people, including Diamond Rhodes and Keitrae Battle, were present. Rhodes and Bussey were friends, having met at Gordon College, and Battle knew Bussey through a mutual friend. Rhodes and Battle both testified that they regularly socialized at Bussey's house. At trial, Johnson testified that he heard a knock on the door and opened it. He testified that "all [he] remember[ed] [wa]s a gun in [his] face and they came in." When asked "how many people came in," Johnson said, "[i]t was three guys. One stood at the door. Lekievius and Shameik, they came in." Johnson added that he recognized Appellant and Spinks even though they had their faces partially covered from the mouth down. Appellant was armed with a handgun, and Spinks was armed with a shotgun. When Appellant and Spinks came into the house, "they asked for money and whatever was valuable." According to

Johnson, Appellant went to the living room where Holmes was sitting and had him bend over a table. Bussey then came from the back of the house and tried to talk to the intruders. Bussey approached Spinks and attempted to take the shotgun from him. The two men struggled for it, then "a shot [went] off," and Bussey fell to the floor. After the shot was fired, Appellant and Spinks "were still demanding . . . stuff." Spinks took Johnson to Bussey's room and Appellant took Holmes to Johnson's room. Johnson found Rhodes's handbag in Bussey's room and gave it to Spinks. Shortly after that, Appellant and Spinks left. At trial, although Johnson identified Appellant as one of the intruders in the house that night, he acknowledged that, when he was first interviewed by the police, he did not say that Appellant was present during the crimes. According to Johnson, at the time of the interview, he had "just witnessed the murder of my best friend," and "my mind was elsewhere." Johnson testified that the crimes lasted five to ten minutes.

Holmes's testimony tracked that of Johnson, and he added that Appellant came into the house with his hoodie pulled up to his

6

mouth but that Appellant let his hoodie slip down, allowing Holmes to see his entire face. Holmes added that the other person had a bandana covering his mouth but not the rest of his face and that he recognized that person as Spinks. According to Holmes, Appellant was carrying a revolver, and Spinks had a shotgun. Holmes also acknowledged that, in an interview with the police, he was shown a photograph only of Appellant, but added that the photograph "just confirmed [Appellant's] name" and did not "suggest to [him] that that night it was Lekievius."

When Battle heard intruders come into the house, she hid in the bathtub. However, once she heard shots, she tried to exit the house through the front door but was stopped by one of the intruders and stayed near the front door until she saw the three intruders exit the house and walk around the left side of it.

According to Smith, who lived in the neighborhood, he, Appellant, Spinks, and some other people were at the home of Ardrana Pate on the night of the crimes. Smith added that he had been friends with Appellant since he "was young"; that he had

known Spinks since the summer of 2010; and that he had met Bussey "through [Appellant]." Smith added that he left Pate's house between midnight and 1:00 a.m. and that Spinks later texted him, asking him "to hit a lick," which Smith said meant to commit a robbery. Smith agreed and went outside his house to smoke a cigarette. He then saw Spinks and Appellant "coming down," with Appellant carrying a handgun and Spinks carrying a shotgun. Smith, who testified that he did not have a weapon, "jumped off [his] porch" and the men "ran over to the [victims'] house." According to Smith, Appellant and Spinks knocked on the door, and when someone answered, Appellant and Spinks went into the house. Smith heard Bussey trying to "calm everything down," but, he added, "they started tussling." Smith then heard two shots; "[t]he first one was kind of loud, but the second one was very loud." Smith did not see who was shot, and he then ran to his driveway, from where he saw Appellant and Spinks running. He saw Appellant and Spinks go by a neighbor's house, and "then [he] saw a person throw a shotgun over the fence." On cross-examination, Smith

8

acknowledged that he had given "different versions" of the events of that night in interviews with law enforcement officials. Among other versions, Smith told officers that he thought Spinks and Appellant were the perpetrators, but that it was just a "guess" and that he was home in his kitchen when he heard gunshots; that Spinks, Appellant, and a man named Kellius Collier committed the crimes and that he was at home and saw "the whole thing out [of his] window"; that he was on his porch when he saw Spinks, Appellant, and an unspecified third person commit the crimes; that he did not know anything about the crimes; and that he participated in the crimes by standing in the doorway of the victims' house. Smith testified that he had given these different versions because "[he] was scared. It was [his] first time ever [to] be in trouble."

Ardrana Pate, who lived near the victims' home, testified that she knew Smith and Appellant and had met Spinks. She also knew the victims. Pate testified that on the night of December 4-5, 2010, Appellant, Spinks, Smith, and Ashley Parker came to her house. Smith was the last to arrive, shortly after midnight. She added that

9

she overheard the group "[j]okingly saying that [it] would be a sweet lick" to rob the victims' home and that Appellant asked Spinks to let him "see the piece." According to Pate, Spinks had a small backpack and Appellant "thought that the gun was in it and he went in it and it actually wasn't in there. [Spinks] said . . . [he] moved it." She added that they left her house at about 1:30 to 1:45 a.m. on December 5. Similarly, Ashley Parker, who knew Appellant, Smith, and Spinks, testified that she was at Pate's house with the three men and then went to Appellant's home, leaving Appellant's house at about 1:45 a.m.

Immediately after the shooting, an occupant of Bussey's house called 911, and law enforcement officials arrived at the crime scene around 3:52 a.m. Bussey had been shot once in the leg with the handgun and once to the right side of his face with the shotgun. The shotgun wound was fatal. Law enforcement officers subsequently recovered a pump shotgun from the back yard of a home on Westchester Drive. A GBI firearms examiner determined that a shotgun shell found at the crime scene was fired from that shotgun.

10

Although a .22-caliber bullet was recovered from Bussey's leg, the handgun used in the crimes was never recovered.

GBI Agent Cayce Ingalls testified about text messages that Appellant and Spinks sent to each other from December 4 to 5, 2010. For example, at 4:37 p.m. on December 4, Spinks sent Appellant a text message saying that he would "be over" and that he had "the 22 and the 22 bullets and the pump shells." At 7:43 p.m. on December 4, Appellant received a text message from Spinks saying that "n****s just pulled up on me. Then I start poppin and they got scared LOL they was just like tell [Appellant] it's on site and I was like then it's on. . . . They bi**hes LOL you wanna kill these n****s."

In the meantime, from December 4 to 5, Spinks was texting a person named Marquevus Smith. At 9:00 a.m. on December 4, Spinks asked Marquevus if he had "the pump shells I gotta hit the big lick . . . today," and at 2:00 p.m. on December 4, Spinks asked Marquevus if he had "the 22." Marquevus responded that he had the pump shells, and with regard to Spinks's question about the "22," Marquevus told Spinks to "stop texting nonsense my n***a text

11

messages get tracked." Around 6:00 p.m. on December 4, Spinks directed Marquevus to leave "the pump and the 22" under the porch of Spinks's aunt. In text messages around 1:40 to 1:55 a.m. on December 5, Spinks told Marquevus that he "might have to come hit this lick"; that this was the "best time" to hit "them college n****s down there in the house with some hoes"; rob "them soft ass college boys . . . is a sweet lick 'cause they gonna show us where everything at"; and that "them hoes gonna be quiet cause they gonna be scared to get shot." Marquevus, however, declined to participate, saying that the college girls would be "snitching" and he knew that "all of them . . . got cell phones."

The State also offered evidence that Spinks texted Smith at 1:55 a.m. on December 5, asking him if he "want[ed] to hit a lick." Smith asked, "where about and what's it worth." Spinks replied that "it's [the] college boys," and Smith said that he lived "right by" them, that he watched them, that there "ain't none in there worth all that." Smith added that they should "wait 'til [they were] gone." Spinks replied that they would get nothing "when they gone," and Smith

12

asked Spinks if he was at Appellant's house. Spinks replied that he was, and at 2:13 a.m., Smith texted Spinks that he would "be up there when [he] g[o]t back from" a friend's house. At 2:37 a.m., Spinks texted Smith "where you at [be]cause we left Kevius's house. He went to sleep."

Agent Ingalls and Lieutenant Al Moltrum of the Barnesville Police Department interviewed Appellant at 8:37 a.m. on December 5, as well as at 2:39 p.m. that same day. In the first interview, Appellant denied committing the crimes, saying that he did not "go to [the victims' home] last night," that he "ain't went down there and shot nobody," and that "[i]f them boys saying I was at they house," they were lying, "[p]robably 'cause they don't like me." He also denied being with Spinks on the night of December 4-5, adding that he was home by 10:45 p.m., got into the bed that he shared with his little brother, and went to sleep. In the second interview, law enforcement officials informed Appellant that they had learned, contrary to Appellant's statements during his first interview, that Spinks was with him on the night of the crimes. Appellant continued

13

to deny his involvement in the crimes, saying that he was home in bed. Appellant, however, did say that Spinks texted him on the night of December 4 and told him about his argument with Bussey and his friends that night. According to Appellant, Spinks said that he was "going to get them." Appellant told Spinks to "stay out [of] their way." Lieutenant Moltrum told Appellant that Pate had told the officers that Spinks and Appellant were at her house around 2:00 a.m. on December 5 and that Appellant had gotten himself into trouble in the first interview in saying that he had gone to sleep around "midnight." Appellant said that Pate was "lying" and that it was "probably later than that" when he went to sleep. Similarly, when Lieutenant Moltrum informed Appellant that Spinks had said that Appellant was with Spinks "the whole time," Appellant said that Spinks was lying.

Appellant and Spinks testified in Appellant's defense at trial. Spinks testified that Appellant did not plan or take part in the robbery. According to Spinks, the last time he saw Appellant on the night of the crimes, Appellant "said he was going to go to sleep." He

added that, during his plea hearing, he told the trial court that, if Appellant were convicted, the "court would be convicting an innocent man." He further testified that he, Smith, and "some dude [Smith] brought named Pooh" committed the crimes.

Appellant testified that he lived on Westchester Drive with his mother, father, little brother, and sister, where he shared a bedroom with his little brother, who is six years old. He added that he knew Smith, who lived down the street from him, and that he had known Spinks since August 2010. With regard to Spinks's text at 4:37 p.m. on December 4, Appellant said that he thought that Spinks was simply saying that "he was happy that he had a gun." Appellant added that he saw Spinks about 8:30 that night at a friend's house and that Spinks had a book bag with him with a .22-caliber revolver inside of it. Appellant left the friend's house and went home. However, after midnight on December 5, he went with Spinks and Parker to Pate's house. After leaving Pate's house, Appellant, Spinks, and Parker went to Appellant's house, where they drank and watched television in the garage. According to Appellant, he

subsequently went to bed, and Spinks and Parker left his house. Appellant then called his girlfriend and then went to sleep. Appellant testified that he was not "involved in any way with the robbery of" Bussey and his friends. On cross-examination, Appellant acknowledged that he told the police on the morning of December 5 that he had not seen Spinks on the night of December 4 to 5 and did not know where Spinks was.

Cell phone records showed that Appellant spoke with his girlfriend for about 45 minutes beginning at 2:26 a.m. on December 5. Appellant's girlfriend testified that, during this conversation, she heard Appellant tell his little brother to "scoot over in the bed." She added that she did not hear any background noise during the conversation and that Appellant did not mention anything about planning a robbery. According to Appellant's girlfriend, Appellant fell asleep several times during their conversation. She also testified that Appellant called her back at 4:06 a.m. that same morning and told her that someone in the neighborhood had been shot. Appellant "sounded like he had just [woken] up, like he had been asleep."

16

According to Appellant's girlfriend, he did not appear to be out of breath or "sound as though he had been running."

2. Appellant claims that the evidence is insufficient to support his convictions because he was not "competently identified" as one of the assailants. However, the evidence establishing Appellant's identification as a participant in the crimes was sufficient. That evidence included testimony from a co-indictee and two victims that Appellant entered the victims' house with a handgun and participated in the crimes committed therein. It also included evidence that contradicted the version of events that Appellant initially gave to law enforcement officials regarding his activities on the night of the crimes. This evidence, viewed in the light most favorable to the verdicts, was clearly sufficient as a matter of constitutional due process to authorize a rational jury to conclude that Appellant participated in the crimes committed at the victims' house. See *Jackson v. Virginia,* 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Ward v. State,* 316 Ga. 295, 298 (888 SE2d 75) (2023) (explaining that "the testimony of a single witness is

generally sufficient to establish a fact" (cleaned up)). Although Appellant claims that the identifications of him were not reliable, it was for the jury to resolve "conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Graham v. State*, 313 Ga. 436, 440 (870 SE2d 424) (2022) (cleaned up).

3. Relying solely on the non-binding, solo concurrence by Justice Stevens in *Ball v. United States*, 470 U.S. 856, 867-868 (105 SCt 1668, 84 LE2d 740) (1985), Appellant argues that double jeopardy concerns prohibited his prosecution on the multi-count or "multiplicitous" indictment in this case. This claim, however, is without merit. First, the majority in *Ball* explained that "even where the [Double Jeopardy] Clause bars cumulative punishment for a group of offenses, the Clause does not prohibit the State from prosecuting the defendant for such multiple offenses in a single prosecution." Id. at 860 n.7 (cleaned up). Similarly, we have held that the "procedural protections against double jeopardy apply only to 'multiple prosecutions,' meaning multiple or successive

18

indictments or criminal proceedings" and "do not apply to a single indictment that contains multiple counts." *Williams v. State*, 307 Ga. 778, 779 (838 SE2d 235) (2020) (cleaned up). For these reasons, this claim fails.[3]

4. Appellant contends that the trial court erred in not permitting the jury to have access to a transcript of an interview of Johnson by law enforcement officials as a past recollection recorded.[4] However, at trial, Appellant contended only that the jury should have access to a short written statement that Johnson gave to the

---

[3] As part of his argument in the enumeration concerning the indictment, Appellant raises an issue about the trial court's response to a jury question. During its deliberations, the jury asked the trial court whether, with regard to the tampering with evidence count of the indictment, the State had to prove that Appellant "was the one who physically had possession of the shotgun and was the one who disposed of the weapon." The trial court answered "no" to this jury question, and Appellant contends that the answer was an abuse of discretion. However, Appellant affirmatively waived this issue by agreeing that the correct answer to the jury's question was "no." See *Hughes v. State*, 310 Ga. 453, 457 (851 SE2d 580) (2020) (appellant affirmatively waived any error in answering the jury's questions on the issue of proximate cause when he "agreed that re-reading the indictment was the appropriate means to answer the jury's questions").

[4] Appellant contended that the transcript should either be read to the jury or given to them to review in the jury box. He did not seek to have the jury take the transcript to the jury room. The transcript of Johnson's interview was not introduced into evidence at trial.

police, not that the jury should be given access to the transcript of Johnson's interview. There is therefore no ruling by the trial court on an evidentiary issue regarding the transcript of Johnson's interview. Because this case was tried in 2012 under our former Evidence Code, plain error review of the evidentiary claim that the trial court erred in not granting the jury access to the transcript of Johnson's interview is not available. See *Pyatt v. State*, 298 Ga. 742, 746 n.7 (784 SE2d 759) (2016) (explaining that plain error review under our current Evidence Code "applies only to any motion made or hearing or trial commenced on or after January 1, 2013" (cleaned up)). Moreover, under the former Evidence Code, because Appellant did not seek at trial to have the jury be given access to the transcript of the interview, any error in denying his request to give the jury access to it is not preserved for appeal. See *Rucker v. State*, 293 Ga. 116, 121-122 (744 SE2d 36) (2013) (holding, in a case under the former Evidence Code, that a claim that the trial court erred in not permitting the introduction of certain evidence was not preserved for review because the defendant did not seek to introduce the

evidence during trial).

5. Appellant contends that the trial court erred in denying his motion to suppress the pretrial and trial identifications by Johnson, Holmes, and Smith. More specifically, Appellant contends that the identifications were the result of impermissibly suggestive procedures and thus violated his right to due process. We conclude that these claims fail.[5]

(a) First, Appellant raised no objection at trial to Smith's identification of Appellant as one of the perpetrators. Appellant's challenge to Smith's testimony is therefore not preserved for review. See *Lane v. State*, 312 Ga. 619, 622 (864 SE2d 34) (2021) (explaining that "in the absence of a timely objection, there is no appellate review of evidentiary rulings under the old Evidence Code" (cleaned up)).

---

[5] We note that, with the adoption of OCGA §§ 17-20-1 through 17-20-3, "the Georgia General Assembly has prioritized improving the accuracy of eyewitness identifications." *Curry v. State*, 305 Ga. 73, 76 n.3 (823 SE2d 758) (2019). These provisions, however, did not become effective until July 1, 2016, after the trial of this case.

(b) Appellant sought to suppress Johnson's in-court identification of him on the ground that Johnson's identification was the result of an impermissibly suggestive process because Holmes told Johnson that Appellant was one of the gunmen.[6] In this regard, at trial, when Johnson was asked on cross-examination whether he remembered telling law enforcement officials during his second interview that Holmes told him that Appellant was the "guy" behind Spinks during the crimes, Johnson testified, "yeah, he told me. We talked about it. . . . But he didn't say, like — you know, it wasn't no, like, I didn't know who it was." However, the due process principles on which Appellant relies, as explained by such cases as *Neil v. Biggers*, 409 U.S. 188 (93 SCt 375, 34 LE2d 401) (1972), and *Simmons v. United States*, 390 U.S. 377, 384 (88 SCt 967, 19 LE2d 1247) (1968), apply only when the suggestive circumstances leading to an identification are arranged or orchestrated by law enforcement

---

[6] At the hearing on the motion to suppress, Johnson testified that he was never shown any lineup by law enforcement officials. No other evidence was offered on this point. In addition, there was no evidence offered at trial of any pretrial identification of Appellant by Johnson.

22

officials. See *Perry v. New Hampshire*, 565 U.S. 228, 232-233 (132 SCt 716, 181 LE2d 694) (2012) (explaining that "we have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers"; that "our decisions . . . turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array"; and that "when no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt" (cleaned up)); *Morrall v. State*, 307 Ga. 444, 449 (836 SE2d 92) (2019) (quoting the foregoing principles from *Perry*). See also *Clay v. State*, 309 Ga. 593, 598 (847 SE2d 530) (2020) (holding that, where a witness identified the defendant in a photo array after seeing a news report of the defendant's arrest, the

defendant could not challenge the witness's identification based on the foregoing due process principles because the defendant was not "challenging the identification procedure used by law enforcement, but, instead, is challenging the weight and credibility of [the witness's] identification," matters that were reserved for the jury). For the foregoing reasons, we conclude that the trial court did not err in denying Appellant's motion to suppress Johnson's identification testimony.

(c) In contrast, Appellant's claim regarding Holmes's identification testimony implicates due process concerns because the record shows that, at Holmes's interview with law enforcement officials on the morning of the crimes, he identified Appellant as being involved in the crimes after law enforcement officials showed Holmes a single photo of Appellant.

"If an out-of-court identification by a witness is so impermissibly suggestive that it could result in a substantial likelihood of misidentification, evidence of that out-of-court identification violates due process and is inadmissible at trial."

*Lewis v. State*, 314 Ga. 654, 662 (878 SE2d 467) (2022) (cleaned up).

We employ "a two-step process in examining a trial court's admission of identification evidence for error," first deciding "whether the identification procedure used was impermissibly suggestive." Id. (cleaned up). "An identification procedure is not impermissibly suggestive unless it leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is the equivalent of the authorities telling the witness, 'This is our suspect.'" Id. (cleaned up). "Second, if a trial court properly concludes that the State employed an impermissibly suggestive pre-trial identification procedure, the issue becomes whether, considering the totality of the circumstances, there was a substantial likelihood of irreparable misidentification." Id. (cleaned up). If there is not a substantial likelihood of irreparable misidentification, "then both the pre-trial and in-court identifications are admissible." *Curry v. State*, 305 Ga. 73, 76 (823 SE2d 758) (2019) (cleaned up). We consider the "totality of the circumstances" in determining whether there is a substantial likelihood of irreparable misidentification. See

*Howard v. State*, 318 Ga. 681, 687-688 (899 SE2d 669) (2024).

> Factors to consider include (1) a witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation.

Id.[7] "Moreover, whether the witness knows the defendant is a critical factor in determining the reliability of an identification." *Lewis*, 314 Ga. at 670 (cleaned up). "We review a trial court's ruling on a motion

---

[7] In two recent cases, we have noted that there is tension between the "level-of-certainty" aspect of the due process test for determining the likelihood of misidentification and our holding in *Brodes v. State*, 279 Ga. 435 (614 SE2d 766) (2005), that trial courts should "refrain from informing jurors [that] they may consider a witness's level of certainty when instructing them on the factors that may be considered in deciding the reliability of that identification." Id. at 442. See *State v. Harris*, 316 Ga. 272, 281 n.12 (888 SE2d 50) (2023); *Pearson v. State*, 311 Ga. 26, 29 n.5 (855 SE2d 606) (2021). In *Harris*, we explained that

> [w]hile it seems incompatible that a trial judge should consider the witness's level of certainty when determining the likelihood of misidentification but the jury may not be instructed to consider the witness's level of certainty when determining the reliability of the identification, no one has asked us to reconsider our decision in *Brodes*, and the trial court's consideration of this factor is expressly sanctioned under [U.S.] Supreme Court precedent, see *Neil v. Biggers*, 409 U.S. 188, 199 (III) (93 SCt 375, 34 LE2d 401) (1972).

316 Ga. at 281 n.12.

to suppress identification evidence for an abuse of discretion," *State v. Harris*, 316 Ga. 272, 280 (888 SE2d 50) (2023), and in reviewing a ruling on such a motion, "evidence is construed most favorably to uphold the findings and judgment and the trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous." *Wright v. State*, 294 Ga. 798, 801 (756 SE2d 513) (2014) (cleaned up). Finally, "in determining whether the trial court erred in denying the motion to suppress identification testimony, this court may consider the evidence adduced both at the suppression hearing and at trial." Id. at 802 (cleaned up).

At trial, Lieutenant Moltrum and Agent Ingalls testified that they conducted an interview with Holmes at 6:11 a.m. on December 5, about two hours after the crimes. They added that Holmes identified a man he referred to as "Kevian's cousin" as being the perpetrator with the shotgun, but that Holmes said "not really" when asked if he could identify the second perpetrator who entered

27

the house with a handgun.[8] Because Lieutenant Moltrum had heard officers at the crime scene discussing names like "Lekievius Collier," "Kevius," and "Lekievius Eleby," and because Lieutenant Moltrum knew a "Kelius Collier," as well as Appellant, he asked Holmes about "Kevian," such as where he lived. Lieutenant Moltrum asked Holmes if "Kevian" lived three or four houses away from the victims, and Holmes said that he did. Lieutenant Moltrum knew that Appellant lived at that location, and he showed Holmes a copy of Appellant's driver's license. Holmes recognized the picture on the driver's license and identified the person depicted as "Kevian" and said that he was the second intruder. The trial court did not address whether the use of a single photo for identification was impermissibly suggestive, but skipped to the second part of the due process test, ruling that there was not a substantial likelihood of irreparable misidentification. We conclude that, even assuming that showing Holmes the driver's license photograph was impermissibly

---

[8] At the pretrial hearing and at trial, Holmes denied that he initially said that he could identify the second intruder.

suggestive, the trial court did not abuse its discretion in ruling that there was not a substantial likelihood of irreparable misidentification.

Here, the evidence indicates that the likelihood of irreparable misidentification was low. Holmes had an ample opportunity to view the perpetrator at the crime scene. In this regard, Holmes testified that, at the time of the crimes, a light was on that "really shines into the living room" where he was sitting when the intruders came into the house. Holmes added that he was close enough to touch Appellant and Spinks during the crimes, that Appellant accompanied Holmes to Johnson's bedroom to look for items to take, and that the crimes lasted about seven minutes. Moreover, Holmes had become personally acquainted with Appellant before the crimes and testified that, during the crimes, he was able to see Appellant's face and recognized his voice when Appellant spoke. In addition, Holmes testified that, during the crimes, he was "paying attention" to the people at the door and to the "people who took me to the back" of the house, and he remained certain in his identification of

Appellant as being one of the assailants. Holmes also testified that being shown the photograph of Appellant did not change his "mind in anyway [sic]," as he knew from the crime scene "who had come in the house." Finally, there was only a very short time — about two hours — between the time that Holmes saw Appellant during the crimes and the identification. Considering the totality of the circumstances, we conclude that, even though Holmes failed to initially identify Appellant when speaking to law enforcement officials, the trial court did not abuse its discretion in ruling that the presentation of a single photo to Holmes did not create a substantial likelihood of irreparable misidentification. See *Howard*, 318 Ga. at 688 (holding that an initial photo array that we assumed was impermissibly suggestive did not lead to substantial likelihood of misidentification even where a witness who had not met the defendant before the day of the shooting and who was uncertain in identifying the defendant in the initial photo array had "a significant opportunity to view [the defendant] before and after the shooting" and identified the defendant with certainty in a second photo array);

30

*Harris*, 316 Ga. at 281 (explaining that "if the witness was acquainted or otherwise personally familiar with the suspect before making an out-of-court identification, then there is not a substantial likelihood of misidentification regardless of an impermissibly suggestive procedure" (cleaned up)); *Pearson v. State*, 311 Ga. 26, 30 (855 SE2d 606) (2021) (holding that there was no substantial likelihood of misidentification where the witnesses had a good opportunity to view the perpetrator during the crime, "paid attention to him at that time," expressed certainty in their identifications, and the showup occurred shortly after the crimes); *Wright*, 294 Ga. at 800, 802-803 (rejecting argument that a witness's in-court identification should have been excluded for substantial likelihood of irreparable misidentification where the witness was unable to select defendant definitively from a photo array but testified that his later identification "was based on remembering [the defendant] from the scene of the crime").

6. Appellant contends that the trial court committed plain error when it allowed Agent Ingalls to testify about her

31

understanding of the meaning of various text messages introduced into evidence. However, because this case was tried under our former Evidence Code, plain error review of this evidentiary claim is not available. See *Lane*, 312 Ga. at 622. Moreover, under our former Evidence Code, the claim is not preserved for review because Appellant did not object to the testimony in question. See id. (explaining that under the former Evidence Code, "in the absence of a timely objection, there is no appellate review of evidentiary rulings" (cleaned up)).

7. Appellant contends that the trial court made several errors in sentencing him. We agree with one of Appellant's claims, and we have identified one merger error in Appellant's sentencing that requires correction.

Appellant contends that the trial court erred in failing to merge the aggravated assaults of Holmes and Johnson with the armed robbery conviction. At the outset, we note that the trial court erred in sentencing Appellant on the armed robbery count. Because the armed robbery served as the underlying felony for the felony murder

conviction on which Appellant was sentenced, the conviction and sentence for armed robbery must be vacated. See *Ruff v. State*, 314 Ga. 386, 389 (877 SE2d 239) (2022) (where a defendant is "found guilty only of felony murder, the underlying felony would certainly be deemed to have merged, as a matter of law, into the felony murder and a separate sentence for that underlying felony would not be authorized" (cleaned up)). However, "the same merger analysis applies in determining whether the . . . aggravated assault merged into either the armed robbery conviction or the felony murder predicated on that armed robbery." *Hood v. State*, 309 Ga. 493, 503 n.9 (847 SE2d 172) (2020) (cleaned up). In this regard, we have held that "because there is no element of aggravated assault with a deadly weapon that is not contained in armed robbery, that form of aggravated assault will merge into armed robbery if the crimes are part of the same act or transaction." Id. at 502-503 (cleaned up). However, "where one crime is completed before another crime, the 'same conduct' does not establish the commission of both offenses." *Jackson v. State*, 318 Ga. 393, 411 (897 SE2d 785) (2024) (cleaned

up). Here, the aggravated assaults of Holmes and Johnson were completed once Appellant and Spinks entered the house and pointed their guns at Holmes and Johnson, and the armed robbery was based on Appellant and Spinks subsequently taking the victims to bedrooms in the back of the house and taking a purse from one of the bedrooms. Under these circumstances, the aggravated assaults do not merge with the armed robbery conviction. See *Thomas v. State*, 289 Ga. 877, 878-881 (717 SE2d 187) (2011) (holding that where the defendant committed an armed robbery against the victim in the music room of an apartment, but where the victim was subsequently forced into a nearby bathroom and the defendant committed an aggravated assault against the victim in the bathroom, the conviction for aggravated assault did not merge with the conviction for armed robbery because "although the conviction for the armed robbery of [the victim] also resulted from the music-room holdup, the conviction for his aggravated assault was based on Appellant's forcing the shotgun down his throat later in the bathroom, as the indictment clearly specified"). Cf. *Womac v. State*,

302 Ga. 681, 681-682, 684-685 (808 SE2d 709) (2017) (holding that where the evidence showed that the defendant committed an aggravated sexual battery against a minor on the bed of a motel room, causing the victim to run into the bathroom, where the defendant committed other crimes, the aggravated sexual battery did not merge with the other crimes under *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006), because it was completed before the other crimes were committed).

In addition, contrary to Appellant's contention, the trial court did not err in sentencing Appellant for the separate assaults of Holmes and Johnson, as those counts do not merge with each other. See *Sillah v. State*, 315 Ga. 741, 758 (883 SE2d 756) (2023) ("If crimes are committed against different victims . . . , they do not merge."). Finally, Appellant correctly claims (and the State concedes) that the trial court should have merged the offense of conspiracy to commit armed robbery with the conviction for felony murder predicated on armed robbery. See OCGA § 16-4-8.1 (a "person may not be convicted of both conspiracy to commit a crime

35

and the completed crime"); *Simmons v. State*, 314 Ga. 883, 893 (880 SE2d 125) (2022) (explaining that "the trial court properly merged the count[ ] alleging conspiracy to commit aggravated assault [of the victim] . . . into the felony murder conviction predicated on aggravated assault [of the victim]" (cleaned up)).

8. Appellant claims that the prosecutor made several improper arguments in closing. In particular, Appellant complains that the prosecutor referred to him as a "drug dealer." Appellant, however, did not object to any part of the prosecutor's closing argument. His claim is therefore not preserved for review. See *Poellnitz v. State*, 296 Ga. 134, 136 (765 SE2d 343) (2014) (holding that the defendant's contention that the prosecutor made improper remarks during closing argument was not preserved for review because of the failure to make a contemporaneous objection).

9. Appellant contends that his trial counsel provided constitutionally ineffective assistance by failing to object when Agent Ingalls testified as to her interpretation of certain text messages and when the State introduced autopsy photographs that

36

he contends were gruesome and prejudicial. However, Appellant did not raise either of these claims in his motion for new trial or in his amended motion, where he was represented by appellate counsel. He also did not raise them at the hearing on his motion for new trial, and the trial court did not rule on the claims. Accordingly, he has not preserved these claims of ineffective assistance of trial counsel for review. See, e.g., *Allen v. State*, 317 Ga. 1, 12-13 (890 SE2d 700) (2023) (explaining that "ineffectiveness claims must be raised and pursued at the earliest practicable moment, which for a claim of ineffective assistance of trial counsel is at the motion for new trial stage if the defendant is no longer represented by the attorney who represented him at trial" and holding that appellant did not preserve for review a claim of ineffective assistance where he failed to raise the claim in his initial motion for new trial or the amendment or during the hearing on the motion for new trial, and the trial court did not address the claim in its order denying the motion for new trial (cleaned up)).

*Judgment affirmed in part and vacated in part. All the Justices concur.*

Decided June 11, 2024.

Murder. Lamar Superior Court. Before Judge Wilson.

*Kimberly L. Copeland*, for appellant.

*Jonathan L. Adams, District Attorney, Dorothy V. Hull, Jessica B. Haygood, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, M. Catherine Norman, Elizabeth H. Brock, Assistant Attorneys General*, for appellee.