320 Ga. 673
FINAL COPY

S24A1181. MITCHELL v. THE STATE.

PINSON, Justice.

Kenyatta Mitchell appeals his convictions for the malice murder of Carey Von Moss, the aggravated assault of Marcell Greene, and two counts of possession of a firearm during the commission of each of these felonies.[1]

On appeal, Mitchell contends the trial court erred by admitting into evidence a surveillance video and still images from the video,

---

[1] The shootings occurred on September 5, 2016. On November 30, 2016, a Chatham County grand jury returned an indictment charging Mitchell with malice murder of Von Moss (Count 1), felony murder of Von Moss (Count 2), two counts of possession of a firearm during the commission of a felony (Counts 3, 5), and aggravated assault of Greene (Count 4). After a jury trial from April 5 to April 12, 2021, the jury returned guilty verdicts on all counts. On June 8, 2021, the trial court sentenced Mitchell to life in prison for malice murder (Count 1) and consecutive sentences of five years for each count of firearm possession during the commission of a felony (Counts 3, 5) and 20 years for aggravated assault (Count 4); the felony murder (Count 2) was vacated by operation of law. Mitchell, through his trial counsel, timely filed a motion for new trial on the same day he was sentenced. Mitchell later changed counsel, and his new counsel filed an amended motion for new trial on January 1, 2024. After a hearing on February 20, 2024, the trial court denied the motion for new trial, as amended, on April 9, 2024. Mitchell timely filed a notice of appeal on April 26, 2024. His appeal was docketed to the August 2024 term of court and submitted for a decision on the briefs.

which he contends were not properly authenticated, and by allowing a witness to identify him in the surveillance video and a screenshot taken from it. He also contends that the trial court erred by denying his motion to suppress Greene's identification of him and denying a motion for mistrial after the prosecutor failed to redact hearsay from a recorded witness interview that was played for the jury. And he contends that the cumulative effect of these errors requires a new trial.

Each claim fails. The surveillance video and the screenshots taken from it were properly authenticated. The trial court did not abuse its discretion by allowing a witness to identify Mitchell in the surveillance video and screenshot because the witness's identification was helpful to the jury given the poor quality of the images, and the witness was present during the events shown in the video and could testify about his personal knowledge of those events. The trial court did not abuse its discretion by denying the motion to suppress the identification because the likelihood of irreparable misidentification was not substantial, and the court did not abuse its discretion

2

in denying the motion for mistrial because it instead gave a sufficient curative instruction to disregard any hearsay statements in the unredacted recording. And because the trial court did not err in any of these respects, there are no errors to assess cumulatively. Because Mitchell's claims fail, his convictions are affirmed.

1. *Background*

The evidence at trial showed the following. On September 5, 2016, Greene and Von Moss were both staying at a home on West 42nd Street in Savannah, Georgia. Greene walked outside the home and saw Von Moss talking to a man dressed in brown clothing. The man in brown then pulled out a gun and shot Von Moss. Greene shouted, and the man in brown turned and shot Greene, too. Greene ran toward the back of the home, heard another gunshot, and saw Von Moss fall in the driveway of the home. Someone called 911, and Greene was taken to the hospital, where he was treated for a gunshot wound to his left forearm. Von Moss died from a gunshot wound to his torso. Soon after the shooting, Greene was shown two photo lineups and, in the second lineup, identified Mitchell as the shooter.

3

Mitchell's friend, Rashid Simmons, testified at trial that on the day of the shooting he borrowed his girlfriend's "truck" and drove Mitchell to "somewhere on 42nd or something."[2] When Simmons dropped Mitchell off, Simmons also got out of the truck and saw Mitchell walk around the corner to Jefferson Street. Simmons then heard gunshots, turned, and saw Mitchell running back toward the truck. Mitchell got into the driver's seat of the truck and drove away without Simmons. Simmons identified himself and Mitchell in a video and screenshots taken from the surveillance camera of a home on West 41st Street.

Megan McLoud Cela testified she had been walking near the 300 block of West 41st Street and Jefferson Street on the day of the shooting. She stopped to speak to a man who parked his SUV on West 41st Street, and then another man wearing "a brownish bur-

_____

[2] At the time of the shooting, Simmons's girlfriend owned a two-door Ford Explorer, which she let Simmons borrow on the day of the shooting. Simmons and his girlfriend called the Explorer a "truck," but other witnesses called it an "SUV."

gundy . . . shirt and dark colored pants" ran around the corner yelling "I did it, I did it, I did it." The man who yelled "I did it," then got into the SUV and drove away without the other man. Cela then "went to the corner and kind of looked around." She saw a group of men and asked if they were okay; they said they had been doing construction work next to the home "where the incident occurred." She knew which home they were talking about and went there, where she found Von Moss "down on the ground bleeding profusely." She took off her T-shirt and used it to try to stop the bleeding while they waited for the ambulance to arrive.

One of the men doing construction next to the home where the shooting occurred, Kevin Bridges, testified that he heard the gunshots and ran, then saw the shooter running behind him. Bridges said the shooter may have been wearing "light tan" clothing.

Mitchell's wife, Brianna Mitchell, testified that Mitchell told her about the shooting on September 5, 2016, when he returned home after being gone for "a couple of days." Mitchell told her he had shot and killed someone who "supposedly" had broken into his

grandmother's home. Brianna did not know the man who was killed, but Mitchell told her he "went and stood basically right in front of the house and started shooting," and then "[h]e took off running to his friend's truck, and he left in that truck." She said the truck belonged to Mitchell's friend "Black." (Simmons went by that nickname.) And she learned later that Mitchell had shot a second person.

Brianna testified that she knew what Mitchell told her about the shooting was true because he showed her a statement from a witness on a website, and she recognized the witness's description of the shooter's clothes. The witness had described an outfit Mitchell wore often: brown suede sweatpants with a white stripe on the side of the legs and a brown shirt. Mitchell wore that outfit on the last day Brianna saw him before the shooting. When Mitchell returned home and told Brianna about the shooting, he was not wearing the same brown outfit, and she had not seen that outfit since. Brianna was shown the surveillance video that had been admitted into evidence, and she testified that she recognized the outfit the man in the video wore as the same one Mitchell was wearing when he left home

6

two days before the shooting (the last time she saw him before the incident).

2. *Authentication of Surveillance Video and Screenshots*

Mitchell contends that the trial court erred by admitting a surveillance video and screenshots taken from the video because the time stamp on the video was inaccurate and, thus, neither the video nor the screenshots were properly authenticated. Rulings that admit evidence over an objection to authentication are reviewed for an abuse of discretion. See *Henderson v. State*, 317 Ga. 66, 86 (8) (891 SE2d 884) (2023).

(a) At trial, Gregory Bratton testified that he lived on West 41st Street at the time of the shooting, and his home had a working camera-surveillance system at that time. Bratton confirmed that the surveillance system ran and recorded all the time, and it also recorded the date and time. He identified State's Exhibit 8 as a disc containing surveillance footage from his home. He affirmed that it was a fair and accurate depiction of the recording provided to the

7

police and had not been altered in any way. The recording was admitted without objection and published to the jury.

As the video played, Bratton identified the street shown in the footage as the 300 block of 41st Street. Bratton said the date on the video (9/5/2016) was correct but that the time stamp (3:44, 43 seconds) was "not exactly the right time"; he could not remember how far off the time was but had "mentioned it" when he gave the video to the police.

Based on Bratton's testimony, Mitchell's counsel objected to the admission of the surveillance video because the time stamp was "an unknown number of minutes off." The State responded that "the time stamp[ ] is irrelevant . . . to admissibility," and Mitchell's counsel could cross-examine Bratton about the time stamp, which would go to the weight of the evidence. The court ruled that Bratton authenticated the video and it was admitted. Mitchell's counsel did not ask Bratton any questions on cross-examination.

Sergeant Zachary Burdette later identified State's Exhibits 9 through 12 as screenshots taken from Bratton's home surveillance

video. Sergeant Burdette testified that each photo was a fair and accurate representation of the screenshot. The screenshots were admitted over defense counsel's objections, which were based on his continuing objection to the admission of the surveillance video from which the screenshots were taken. State's Exhibit 9 showed an "SUV" traveling west "roughly a block away" from the crime scene. The other photos showed the 300 block of West 41st Street, which was between Jefferson and Montgomery Streets. The crime scene was at the corner of 42nd Street and Jefferson Street.

(b) Mitchell has not shown that the trial court abused its discretion by admitting the surveillance video and the screenshots taken from it. See *Henderson*, 317 Ga. at 86 (8). The Evidence Code's authentication requirement is met "by evidence sufficient to support a finding that the matter in question is what its proponent claims." OCGA § 24-9-901 (a). For authentication purposes, video recordings from autonomous cameras must be based on "competent evidence," and the video must show contemporaneous date and time stamps.

OCGA § 24-9-923 (c).[3] But "the fact that the date-time stamp does not reflect the actual time when the images were captured goes to the weight to be given the evidence, not its admissibility." *Brannon v. State*, 298 Ga. 601, 609 (5) (783 SE2d 642) (2016) (citation and punctuation omitted). Thus, the fact that the time stamp shown on Bratton's home surveillance video was "not exactly the right time" did not make the video or the screenshots taken from it inadmissible on authentication grounds, and the trial court did not abuse its discretion by admitting this evidence over Mitchell's objections. See id. See also *Henderson*, 317 Ga. at 86 (8).

3. *Witness Identification of Mitchell in the Surveillance Video and Screenshots*

Mitchell contends that the trial court erred in allowing Mitchell's friend, Simmons, to identify the person in the surveillance video from Bratton's home and from a screenshot taken from the video

---

[3] OCGA § 24-9-923 (c) applies to "photographs, motion pictures, video recordings, and audio recordings produced at a time when the device producing the items was not being operated by an individual person or was not under the personal control or in the presence of an individual operator."

10

because the quality of the video and screenshot were so poor that any identification was unreliable. We review a trial court's ruling to admit evidence for an abuse of discretion. *Sinkfield v. State*, 318 Ga. 531, 545 (6) (899 SE2d 103) (2024).

(a) The surveillance video from Bratton's home on 41st Street was played during Simmons's testimony.[4] Simmons said he was driving the truck at the point shown in the video and identified himself in the video. He also identified Mitchell as the man shown running to the truck in the video. Simmons clarified that, when the truck first appeared in the video, he had just dropped off Mitchell on Jefferson Street.

The State also showed Simmons a screenshot from the surveillance video and asked him to identify the person in the screenshot. Mitchell's counsel objected to Simmons identifying anyone in the video because doing so "invade[d] the kin [sic] of the jury" because it did not "require any special knowledge of the jury to observe on their

---

[4] The video was also played during the testimony of other witnesses, but Mitchell's claim on appeal relates only to Simmons's testimony about the video.

11

own." The State responded that the video was not "so clear that the jury can determine on their own who that individual is" and Simmons had a "special ability to identify that person that th[e] jury does not" because Simmons himself was in the video and photo and knew who else was there. The court overruled the objection and ruled that Simmons could "explain what he sees in the video to the extent it is not patently obvious on the face of the images, which at this point I believe it's not."

When asked, "who is this individual we see running behind [the truck]?" Simmons said, "I can't see the picture like that. But I'm guessing it's [Mitchell]. It's kind of blurry." Mitchell's counsel renewed his objection, adding, "The witness just said I'm guessing it's somebody. That doesn't sound very knowledgeable to be able to present to the jury special knowledge." The trial court overruled the objection and allowed the State to show Simmons the surveillance video "to see if that helps him. If it doesn't, then I will instruct him not to speculate on who that is." After viewing the corresponding

video footage, Simmons identified the person shown in the screenshot as Mitchell.

(b) Under Rule 701 (a), a lay witness may testify "in the form of opinions or inferences" that are "[r]ationally based on the perception of the witness," "[h]elpful to a clear understanding of the witness's testimony or the determination of a fact in issue" and "[n]ot based on scientific, technical, or other specialized knowledge." OCGA § 24-7-701 (a). Such lay opinion testimony may include a witness's identification of a defendant in surveillance photographs or video recordings, at least where there is "some basis for concluding that a witness is more likely [than the jury] to correctly identify" the defendant as the person in the photo or video. *Glenn v. State*, 302 Ga. 276, 280-281 (II) (806 SE2d 564) (2017) (punctuation omitted) (quoting *United States v. Pierce*, 136 F3d 770, 774 (11th Cir. 1998)).[5]

---

[5] Because OCGA § 24-7-701 is modeled after Rule 701 of the Federal Rules of Evidence, we look to the decisions of federal appellate courts, and of the Eleventh Circuit in particular, that have construed and applied that rule. See *Miller v. Ga. Peanut Co.*, 317 Ga. 22, 26 (1) (a) (891 SE2d 776) (2023) (citing *Glenn*, 306 Ga. at 555 (3); *State v. Almanza*, 304 Ga. 553, 558 (2) (820 SE2d 1) (2018)).

One such basis is the witness's "familiarity with the defendant's appearance." Id. at 280 (II). As we explained in *Glenn*, "in most cases, the opportunity to observe a person's mannerisms, gait, and similar characteristics depicted in video footage will increase the likelihood that a lay witness familiar with a defendant will be better equipped than jurors to identify the defendant from such images." Id. And in *Glenn* itself, we indicated that a lay witness with such familiarity would be in an even better position than jurors to identify the defendant where the video "was of such poor quality that the average juror would not be able to distinguish the faces by themselves." Id. at 281 (II).

Applying those principles here, the trial court did not abuse its discretion in admitting Simmons's lay opinion testimony. Mitchell concedes that the video and images were of poor quality that would make it difficult for a viewer (including a juror) to distinguish the faces of the people shown. And he does not dispute that Simmons had observed Mitchell's appearance, "mannerisms, gait, and similar characteristics depicted in [the] video footage" before, giving him a

14

better chance to correctly identify Mitchell than the jury would have. See *Glenn*, 302 Ga. at 280-281 (II). Moreover, Simmons identified himself in the video and was present for the events shown in the video, making his testimony even more "[h]elpful to a clear under-standing of the witness's testimony or the determination of a fact in issue." OCGA § 24-7-701 (a). So the trial court did not abuse its dis-cretion by allowing Simmons to testify as to whether Mitchell was the person in the video and screenshot.

4. *Admission of Greene's Identification of Mitchell*

Mitchell contends that Greene's identification of Mitchell should have been suppressed. We review a trial court's ruling whether to suppress identification evidence for an abuse of discre-tion. *Eleby v. State*, 319 Ga. 234, 245 (5) (c) (903 SE2d 64) (2024).

(a) Soon after the shooting, Greene, the surviving gunshot vic-tim, identified Mitchell in a photo lineup as the person who shot him and Von Moss. Before trial, Mitchell moved to suppress Greene's identification, and the trial court denied the motion because it con-

cluded that the identification procedure was not impermissibly suggestive.

At trial, Sergeant Burdette explained the Savannah Police Department's photo array procedures as follows. Generally, a set of six photographs were selected and someone other than the lead investigator would show the witness the photographs and go over the admonition form. Someone other than the lead investigator usually would do this because the lead investigator knows which photograph depicts the suspect and the police do not want to "give a hint to the person looking at the photographs who we want them to pick out."

Four days after the shooting, Detective Rebekah Gregory showed Greene a photo array, which was admitted into evidence as State's Exhibit 1. Greene testified that he was not able to identify the person who shot him and Von Moss in this photo array. He "was thinking it was number four in this lineup" but "was indecisive between number four and number six" when he "first saw it." Detective Gregory did not require that Greene choose a suspect in this array, and Greene's signature does not appear on any of the photographs

in this lineup. Sergeant Burdette testified that Mitchell's photo was number six in this lineup.

Three days later, Greene viewed a second photo lineup, which was admitted into evidence as State's Exhibit 2. Sergeant Burdette showed Greene the second photo array himself because he "was the only person in the office" when Greene "was available to come in."

Sergeant Burdette testified that his goal was to select photos for the array that "depict similar characteristics as the person of interest or suspect." He testified that the person in position four of the first lineup — the person Greene had said he would pick "if he had to pick somebody" — did not appear in the second lineup; only Mitchell, who was number six in the first lineup (and whose photo in the first lineup Greene said he "recognized"), appeared in both lineups. An older booking photo of Mitchell was used in the first lineup, while a more recent photo from Mitchell's driver's license was used in the second lineup.

Greene testified that he was left alone with the second photo

17

array "for a while" and during that time he "went through the photos." He thought Mitchell's photo looked "just too familiar," so Greene "set [the photo] across the room" at a distance that he thought approximated the distance from which he saw the shooter. Greene testified that he circled and signed his name next to Mitchell's photograph in the second photo lineup because he recognized the person in the photo as the person who shot him and Von Moss.

On cross-examination, Greene testified that he was "pretty sure" he recognized the person he circled as the person who shot him. When asked by defense counsel, "What percentage would you say?" Greene said, "Percentage enough to bet my life on it." At first, Greene did not recall telling the police he was not 100 percent sure that the person he selected in the second lineup was the shooter. But after Greene's memory was refreshed outside the presence of the jury (with the video of his police interview), he testified that he recalled telling the police during the second lineup that he was not "a hundred percent sure" but, if he had to pick someone from the lineup, he would pick the photo that turned out to be Mitchell's.

18

Greene testified that he circled Mitchell's photo in the second lineup because Mitchell was the man who shot him. Greene said, "They asked me to pick. I was supposed to pick who shot me. That's what I did." When asked on redirect why he circled Mitchell's photo in the second lineup, Greene testified, "Because he stood out. He looked familiar. He looked like the person that shot me. That's the person that shot me." Greene said he would not have circled the photo if it was not the person who shot him, which is why he had not circled any photo in the first lineup.

During Sergeant Burdette's direct testimony, the State introduced the video recording of the second time Greene viewed a photo array. On cross-examination, Sergeant Burdette confirmed that the video showed him telling Greene, after he had viewed the second photo array, "[L]et's do this. If he stands out to you, you believe that picture stands out to you more than the rest, I'm going to have you circle it. Just put your signature here." Sergeant Burdette also confirmed that Greene "couldn't be a hundred percent sure. But if he had to pick somebody, he would pick that picture," which was a

19

photo of Mitchell. Sergeant Burdette confirmed that Greene indicated he also "recognized another photo. But if he had to pick somebody, he wouldn't pick that one. If he had to, he would pick that picture" of Mitchell.

Greene testified that it "was sunny" on the day of the shooting and there was nothing obstructing his view of Von Moss and the shooter, who were standing in the driveway when Greene came outside. Greene described the shooter as someone wearing "all brown." Greene "cursed" when the man shot Von Moss, and then the man "looked at" Greene and shot him, too. From the time Greene walked outside to the time he was shot "maybe 30 seconds" elapsed, or "[e]nough time for [Greene] to walk down the steps." Greene said he "kind of sort of" told the police that he had been looking at the gun during the shooting, but he testified at trial that he was only focusing on it "[a] little bit, not really." He was looking at "[t]he whole situation."

(b) An out-of-court identification by a witness violates due process (and is thus not admissible at trial) if it is "so impermissibly

20

suggestive that it could result in a substantial likelihood of misidentification." *Eleby*, 319 Ga. at 244 (5) (c) (citation and punctuation omitted). An identification procedure is not impermissibly suggestive unless it "leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is the equivalent of the authorities telling the witness, 'This is our suspect.'" Id. (citation and punctuation omitted). If a procedure was impermissibly suggestive, the identification will be excluded only if "considering the totality of the circumstances, there was a substantial likelihood of irreparable misidentification." Id. at 244-245 (5) (c) (citation and punctuation omitted). Those circumstances include the witness's opportunity to view the perpetrator at the time of the crime, his degree of attention, the accuracy of his prior description, his level of certainty, and the length of time between the crime and identification. See id. at 245 (5) (c).

Mitchell contends that the identification procedure used when Greene identified him was impermissibly suggestive because it effectively "narrowed down" his choice to only Mitchell. He points out

21

that after Greene opined that two of the men depicted in the first lineup — Mitchell and a second person — could be the shooter, the police included a photo of Mitchell in the second photo array, but not one of the other man Greene had pointed to in the first lineup. Because only one of the two photos that stood out to Greene in the first lineup was still available, Mitchell contends that it was "virtually inevitable" that Greene would select Mitchell's photo.[6]

Assuming without deciding that this procedure was impermissibly suggestive, Mitchell's argument fails because the likelihood of irreparable misidentification was not substantial. See *Eleby*, 319 Ga. at 246 (5) (c). The evidence showed that Greene had an unobstructed view of the shooter on a sunny day for about 30 seconds, and Greene testified that he was looking at "[t]he whole situation"

_____

[6] Mitchell also notes the procedure used by Sergeant Burdette — giving the photos to Greene and then leaving him alone in a room to look at them — did not comply with OCGA § 17-20-2, but he concedes the failure to follow the statutory procedures does not require exclusion. See OCGA §§ 17-20-2 (b); 17-20-3 ("The court may consider the failure to comply with the requirements of [OCGA § 17-20-2] with respect to any challenge to an identification; provided, however, that such failure shall not mandate the exclusion of identification evidence."). See also *Kirkland v. State*, 310 Ga. 738, 741-742 (2) (a) (854 SE2d 508) (2021).

when Von Moss was shot and the shooter "looked at" Greene before shooting him. See *Curry v. State*, 305 Ga. 73, 77 (2) (823 SE2d 758) (2019) (not a substantial likelihood of irreparable misidentification where witnesses viewed defendant "in full daylight"; "heard a gunshot" and then "ran to see what was happening, and saw two men running from that direction, establishing that the witnesses were fully attentive to observing the two men"; and expressed "extremely high" certainty in their identifications of defendant). And Greene described the shooter as someone wearing "all brown," which is consistent with the clothing that multiple witnesses saw Mitchell wearing on the day of the shooting, and that his wife recognized on the surveillance video. See *Eleby*, 319 Ga. at 245 (5) (c). Greene identified Mitchell one week after the shooting, see id., and although he said he was not "a hundred percent sure" at the time of the identification, he said that Mitchell's photo "stood out" and selected his photo after viewing it from a distance that approximated the distance from which he saw the shooter. And even though Greene did not identify the shooter in the first lineup, he "recognized" Mitchell's

photo in that lineup (but could not choose between Mitchell's photo and someone else's photo) and the second lineup used a different, more recent photo of Mitchell, which may explain why Greene was able to make an identification during the second lineup and makes it less likely that he chose Mitchell's photo because it was also included in the first lineup. See *Howard v. State*, 318 Ga. 681, 688 (2) (899 SE2d 669) (2024) ("[A]lthough [witness] was hesitant about identifying [defendant] in the initial photo array, the uncontested evidence is that [defendant] was wearing a hat that cast a shadow on his face in this photo, both explaining [the witness's] hesitance about identifying him from that photo and making it less likely that the viewing of this photo influenced [the witness's] subsequent, more certain identifications of [defendant]."). Greene also testified at trial that he was sure enough of his identification to "bet [his] life on it" and selected Mitchell's photo because he was the person who shot Greene and Von Moss. Under these circumstances, we conclude the likelihood of irreparable misidentification was not substantial, and so the trial court did not abuse its discretion by denying the motion

to suppress. See id.; *Eleby*, 319 Ga. at 245-246 (5) (c); *Curry*, 305 Ga. at 77 (2).

5. *Denial of Mistrial Motion Based on the Admission of Hearsay*

Mitchell contends that the trial court erred by denying his motion for mistrial because it was undisputed that the State failed to redact a hearsay statement that identified Mitchell as the shooter from the recording of a witness interview. Generally a trial court's denial of a motion for mistrial "will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Grissom v. State*, 296 Ga. 406, 414 (6) (768 SE2d 494) (2015) (citation and punctuation omitted).

(a) During trial, the parties agreed that the State would redact hearsay statements from a witness's interview with the police before playing it for the jury. But when the video was played at trial, a question that contained hearsay — a statement from a third person that Mitchell was the shooter — had not been redacted and was played. Mitchell's attorney objected, and the prosecuting attorney

25

conceded the statement was hearsay but said its inclusion was "inadvertent" and suggested the court give a curative instruction. Mitchell moved for a mistrial based on the admission of the hearsay.

The trial court denied the motion for mistrial because the statement that someone identified Mitchell as the shooter "was made very briefly and in passing by the detective and not by" the witness, and it did not "put[ ] something in front of the jury that [was] shocking or completely revelatory or changes the complexion of the evidence significantly at all." After the court denied the motion, it proposed a curative instruction. Defense counsel stated he wished to "preserve for the record the motion" for mistrial but said the wording of the proposed curative instruction was "acceptable" given the court's denial of a mistrial.

The rest of the video was played for the jury and, once it ended, the trial court instructed the jurors that "[a]nything said by the detectives themselves is not evidence" and they "should disregard any out of court statement in the recording attributed to any person except for statements made by [the witness] or statements that [the

witness] attributed to the defendant."

(b) The trial court did not abuse its discretion in determining that a curative instruction would protect the defendant's rights and so a mistrial was not required. The motion for mistrial was based on the introduction of a hearsay statement through the detective's question to the witness, and the trial court instructed the jury that the detective's statements were not evidence and that they should disregard any statement attributed to someone other than the witness or defendant. Jurors are presumed to follow instructions, see *Grissom*, 296 Ga. at 414 (6), and Mitchell has not offered any reason to think they could not do so here. Nor has he explained how giving the curative instruction instead of granting the mistrial failed to protect his right to a fair trial; indeed, he consented to the wording of the curative instruction. Mitchell has failed to establish an abuse of discretion. See id.

6. *Cumulative Error*

Mitchell contends that he is entitled to a new trial based on the cumulative effect of the trial court's errors. Because Mitchell has not

27

demonstrated any errors, there are no errors to assess cumulatively. See *Blocker v. State*, 316 Ga. 568, 583 (5) (889 SE2d 824) (2023).

*Judgment affirmed. All the Justices concur.*

Decided January 28, 2025.

Murder. Chatham Superior Court. Before Judge Karpf.

*David T. Lock*, for appellant.

*Shalena Cook Jones, District Attorney, Lyle Burnham II, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.